IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

EASTERN DISTRICT—PHILADELPHIA .1869.

## Patterson *et al. versus* Barlow *et al.*

1. The Constitution cannot execute itself: the power to regulate elections is legislative and has always been exercised by the General Assembly.

2. The precincts, places and boards of election, the lists of electors, and the evidence as to persons and qualifications must be prescribed by law.

3. This power is left by the Constitution to legislative discretion, regulated only by the injunction that " elections shall be free and equal."

4. The legislature must establish the tribunal and means of ascertaining who are qualified electors, and must designate the evidence to prove to the tribunal the persons and qualifications of the electors.

5. The law makes elections equal by arranging all qualified electors into suitable districts, making their votes equally potent and so that all shall have an equal share in filling the offices.

6. The Constitution does not require that the regulations to make " elections free and equal" shall be uniform.

7. The discretion belongs to the legislature, is a sound one, and cannot be reviewed by any other department of the government, except in a case of plain, palpable and clear abuse of the power which actually infringes the rights of electors.

8. Mere errors in the execution of the legislative power to regulate elections cannot make the execution unconstitutional.

9. That election is " free and equal" · where all the qualified electors of the precinct are carefully distinguished from the unqualified, and are protected in the right to deposit their ballots in safety and unprejudiced by fraud.

10. The provision of the Constitution that the elector shall have paid a state or county tax within two years, which shall have been assessed *at least* ten days before the election, was to restrain the assessment so that voters might not be fraudulently made at the polls: not that assessments should be compulsory down to the tenth day before the election.

11. If the legislature believe that the best means to prevent frauds in the city elections is to increase the period for the last assessment, it may be done.

(54)

[Patterson *v.* Barlow.]

12. An election law is unconstitutional only when it subverts the true elector's rights; not because the tribunal acting under it may make mistakes or even abuse its functions.

13. The Act of April 17th 1869 (Registry) is constitutional.

14. *Quære,* whether private complainants have any standing to represent the public or the court jurisdiction to enjoin one of the political systems of the state in its entire scope, because some of its provisions are invalid.

July 2d and 3d 1869.  Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

This was a bill in equity, filed in the Supreme Court on the 4th of June 1869, by William C. Patterson and others against Thomas A. Barlow and others, members of the Select Council of Philadelphia; William Calhoun and others, members of the Common Council; Thomas Dallas and others, aldermen and justices of the peace; David P. Weaver and others, city commissioners; George Getz, City Controller, and Joseph N. Peirsol, City Treasurer.

The bill averred,

1. That the complainants were citizens of the United States and of Pennsylvania, residents, qualified electors, holders of real estate and tax-payers in the city of Philadelphia.

2. That the defendants respectively held the official positions in Philadelphia above stated.

3. That an Act of Assembly supplemental to the Act relating to the elections of the Commonwealth was passed April 17th 1869; the Act being appended and made part of the bill.

4. That the provisions of the Act will entail on Philadelphia a. heavy expenditure of money to be raised by loan or taxation; is in contravention of the 12th section of Article 3 of the Constitution of Pennsylvania, because it adds an additional qualification, and deprives qualified voters of voting; is in violation of the Declaration of Rights in preventing elections from being free and equal, imposes on judicial officers duties not judicial, and said provisions are illegal for these reasons and others to be assigned.

5. That any election under the act will be undue and invalid.

6. That the councils intend to make an appropriation, and the controller, commissioners and treasurer intend to do acts belonging to their respective offices for the purpose of executing the provisions of the act.

7. That the aldermen intend to perform the duties assigned them.

8. That by so doing the complainants' rights as electors and tax-payers will be injured; that the injuries can be redressed only by injunction.

They craved relief:—

1. That the act be declared unconstitutional and invalid.

[Patterson *v.* Barlow.]

2. That an injunction be granted enjoining the defendants from proceeding under the act, from attempting to carry any of its provisions into effect, from appropriating or paying or contracting to pay any money, &c.

The provisions of the act are in substance as follows :—

Sect. 1. Each assessor of the Commonwealth, on the 1st Monday of June annually, shall revise the transcripts received from the county commissioners, striking off persons who have died or removed since the previous assessment, and adding the name of any qualified voter known by the assessor to have removed into his district and the names of all claiming to be qualified voters therein; after the revision, he shall, after visiting the dwelling-houses and careful inquiry, strike off the names of any persons who have died or removed, and add to the list any one entitled, and assess a tax against him. The assessor shall then make out a list of the voters, stating whether they are housekeepers, and designating their residence; if not housekeepers their occupation and place of boarding, &c., with marks indicating whether the voter is between twenty-one and twenty-two, naturalized, &c., and shall make out lists of the new assessments and send them to the city commissioners, who shall add the names to the tax duplicates.

Sect. 2. The commissioners shall place duplicate copies of the list in the hands of the assessors, who before the 1st of August shall put up a copy where the election is held, and retain one for inspection of any resident in the district, and the assessor shall on the personal application of a voter add his name and assess a tax on him, noting his residence, occupation, &c., as in other cases, &c.

Sect. 3. "After the assessments have been completed, on the 10th day preceding the second Tuesday in October, the assessor shall on the Monday immediately following," return to the commissioners all persons assessed since the return required by the 2d section, and the commissioners shall add them to that return, and furnish a copy of *all* the names returned to the officers of the election before 6 o'clock in the morning of the second Tuesday of October, and no one shall vote whose name is not on the list unless he prove his right as afterwards provided.

Sect. 4. On the day of the election a person not on the list and claiming a right to vote shall prove by a qualified voter his residence for ten days before the election; the witness shall make and sign an affidavit of the facts stated by him, and the claimant shall make a similar affidavit, stating his qualifications with particularity and in detail, the affidavits to be preserved as other election papers.

Sect. 5. A qualified citizen may challenge a voter notwithstanding his name may be on the list; and proof of the voter's right shall be publicly made and acted on by the election board;

[Patterson *v.* Barlow.]

a person claiming to vote as a naturalized citizen shall produce his certificate and "voted" shall be endorsed on the certificate, and election officers receiving another vote on the same certificate on the same day, or refusing to endorse the certificate, and also the voter on such certificate shall on conviction each be fined and imprisoned.

Sect. 6. An election officer neglecting to require the proof enjoined by the preceding section, or admitting a voter without proof, shall be punished in the same manner.

Sects. 7 & 8. Similar proceedings as to presidential and special elections.

Sects. 9 & 10. Assessors and election officers to administer oaths and receive compensation.

Sect. 11. On petition of five citizens, stating under oath that they believe frauds will be perpetrated at the election, the Court of Common Pleas shall appoint two overseers, who shall be present with the officers of the election during all the time the election is held, and the returns made out, may challenge voters, &c., and if driven away from the polls by violence or intimidation, the votes at the particular election district shall be rejected when an election shall be contested.

Sects. 12 & 13. Penalty for issuing or conniving at or in any way procuring the issue of fraudulent naturalization papers, or voting on them.

Sects. 14–17. Penalty for officers refusing to serve, hours of holding election, furnishing forms, &c.

Sect. 18. None of the foregoing provisions except those in sections 12 and 13 to apply to Philadelphia.

Sect. 19. Citizens temporarily in the service of the state or the United States not to be deprived of their votes.

Sect. 20. The act entitled "A further supplement to the act relating to the elections of this Commonwealth," approved April 4th 1868, and all other laws altered or supplied by this act, repealed.

Sect. 21. The aldermen or justices of the peace to be members of "The Board of Alderman," created by the act.

Sect. 22. The board to meet on the first Monday of June, annually, and elect a president and other officers.

Sect. 23. The board to elect three citizens in every election division in Philadelphia, to be canvassers in the division, the board to fix the places for the canvassers to meet, and the time and places at which the assessors shall 'meet to make extra assessments, which shall be between the 1st and 20th of September.

Sect. 24. The board, on or before the third Monday in September annually, shall appoint in each election district a judge, two inspectors and two return inspectors to conduct the elections in the city for the ensuing year, the judge and an inspector of

[Patterson *v.* Barlow.]

each class to be from the party having the majority in the election division at the preceding election, and the other two inspectors from the party having the next highest number of votes at such election.

Sect. 25. The judges of the Court of Common Pleas to have power to revise the appointments of canvassers and election officers on petition of five qualified voters, being householders; to revoke improper appointments and make new ones, &c., and to fill vacancies.

Sect. 26. Penalty for not serving as a canvasser or election officer.

Sect. 27. The assessors in Philadelphia, on or before the 1st of June annually, to make a list of voters under the following heads:—1. *Private householders*, who are qualified electors, designating their residence. 2. *Private residents:* such qualified electors as reside with private householders, designating their residence. 3. *Hotels, taverns and restaurants:* such as keep hotels, taverns, sailors' boarding-houses or restaurants, designating the house, &c., and assess upon every person of each of the three classes a tax of 50 cents; no one boarding at any hotel, tavern, sailors' boarding-house or restaurant to be put on the list who is not a qualified voter, having a fixed residence in the division; two transcripts of the lists to be delivered to the commissioners and one to the receiver of taxes, on or before the 30th of June annually, to be verified by affidavit of the assessors that, to the best of their knowledge and belief, every one on the lists is a qualified voter, having a fixed residence in the division; a printed copy of the transcript to be posted in ten places in the division, on or before August 20th annually, with notice that the assessors will meet at the time and places fixed by the board of aldermen (designating them), to make extra assessments, and that the canvassers will meet on the 10th day before the next general election, designating the places and hour to revise and correct the assessors' transcript and complete the registry of votes.

Sect. 28. The assessors to meet in their respective wards at the time and places fixed by the board of aldermen to make extra assessments, which shall not be made after September 20th; and on the personal application of any citizen, and due proof of his qualifications, his name, &c., shall be entered on the extra assessment book; the applicant shall also make an affidavit setting out the particulars of the qualifications as specially designated in the section, the jurat to be signed by the assessors; the claimant shall also, if required by an assessor, prove his residence by two qualified electors; the assessors being satisfied, shall register his name, assess or levy a tax of 50 cents, and give him a certificate of assessment, which shall be put on the affidavit, setting out particularly his name, occupation, &c.

Sect. 29. The assessors shall deliver two copies of the extra assessment to the commissioners and one to the receiver of taxes, who shall file it, receive the tax, and give the person a receipt, the receiver to produce the assessors' certificate, &c., when required by a court or grand jury.

Sect. 30. The commissioners to deliver to the canvassers, not more than three days before their meeting, the assessors' transcripts and extra assessment books.

Sect. 31. The canvassers to meet in their respective divisions at the place fixed by the board of aldermen on the tenth day before the general election, and remain in session from 10 o'clock A. M. till 7 o'clock P. M.; to have power while in session to administer oaths, issue subpœnas and examine any person on oath respecting his own or any other person's qualification, and shall register the name of any person claiming to be a voter and establishing his claim.

Sect. 32. The claimant not on the assessors' transcript to produce to the canvassers a receipt for payment, within two years, of a duly assessed tax, or give satisfactory evidence, by his own or a qualified elector's oath, of such payment and his residence.

Sect. 33. The claimant shall depose that he does not intend to remove from the division before the election; that if then living, he will have resided in the state at least one year next before the said election, and that he will then be at least twenty-one, and not over twenty-two years of age, to the best of his knowledge, information and belief; and if either of the canvassers shall require it, he shall also prove his residence in the manner hereinafter provided; and upon such proofs being made to the satisfaction of the canvassers, but not otherwise, they shall register his name, &c.

Sect. 34. Every person who shall be required by either of the canvassers, or either of the assessors of any ward, to prove his residence in the division, shall, in addition to his own oath or affirmation, prove, by the affidavit of two qualified electors of the division whose names are contained on the assessors' division transcript, under the head of private householder, that such person is personally known to them; that he is a bonâ fide resident of the division, and they verily believe that he will be a qualified voter, entitled to vote in the division at the next general election.

Sect. 35. Every person of foreign birth, claiming a right to be assessed, or to have his name registered on the canvassers' list, shall, in addition to the proof of residence, prove that he has been naturalized conformably to the laws of the United States, and, as evidence thereof, he shall produce a certificate of naturalization, under the seal of the court in which his naturalization took place, duly attested by the signature of the prothonotary or clerk of the said court, in his own proper handwriting; and shall prove, by

[Patterson *v.* Barlow.]

the oath of a qualified elector of the division, that he is the person named in the certificate, and the person to whom it was issued; and shall further answer, upon oath, to the satisfaction of the assessors or canvassers, before whom the certificate may be produced, when and where he was born, and when and where he obtained the certificate, and from whom; and the certificate shall not be evidence that the person presenting it is a naturalized citizen, unless his answers be consistent with the facts certified, and the proof of his identity be satisfactory to the canvassers; and upon such proof being made to the satisfaction of the canvassers, but not otherwise, they shall register the name of the claimant on the canvassers' list, and shall stamp on the certificate of naturalization the word "registered," &c.

Sect. 36. The canvassers at their said session, or at any adjourned session, to be held on the eighth day before the general election, shall carefully examine the assessors' division transcripts, and if they shall find the name of any person thereon not entitled to vote in their division at the next election, they shall strike the name of every such person therefrom; but the name of no person shall be stricken from any transcript in his absence, except upon the testimony of at least two reputable citizens, qualified electors of the division, whose names appear on the transcript, under the head of "private householders," to be given under oath or affirmation, that such person is not a resident of the division, or is otherwise disqualified by law from voting at the said election; and the canvassers shall also examine and revise the extra assessment books and strike therefrom the names of all persons who are not residing in the division on the tenth day before the election; and the canvassers shall add to the extra assessment books of their respective divisions, in alphabetical order, the names on the canvassers' lists, designating each person by his occupation and place of residence and nativity, as aforesaid; and the names remaining on the revised division transcripts and on the extra assessment division books, as corrected by the division canvassers, shall constitute the registry of citizens qualified to vote in the divisions respectively at the next general election: Provided, That if any person so registered shall cease to be a resident of the division before the election, he shall not be entitled to vote therein; and one of the registers of every election division shall be returned to the city commissioners by the division canvassers, to be by them printed and posted in at least ten conspicuous places in the division, at least five days before the election, &c., with similar provisions as to presidential elections, &c.

Sect. 37. That the register shall be the only evidence that the persons whose names are found thereon have resided for ten days immediately preceding the election in the division, and no voter whose name is so registered shall be challenged at the polls on

[Patterson *v.* Barlow.]

any question of residence; but it shall be the duty of the election officers to require every person whose name appears on the extra assessment book of the division, except such as are entitled to vote on age, to produce his receipt for taxes, as evidence of the payment thereof, and prove his identity, if required by either inspector; and the vote of no such person shall be received by the election officers until such receipt is produced, showing that the person offering to vote has paid a state or county tax within two years next before the election, which had been assessed upon him personally at least ten days before the election; and it shall also be the duty of the election officers to require every person of foreign birth who offers to vote at any election, to produce a certificate of naturalization, issued by a court of this state or a court of the United States, under the seal of the court, or a certified copy of the record of his naturalization, if naturalized in any other state; and the vote of no such person shall be received by the election officers, who shall refuse or fail to produce such certificate or certified copy of the record as aforesaid : *Provided,* That no naturalized citizen who shall have resided in the election division for ten years or more immediately preceding such application to vote, shall be required to produce such certificate, but the registry of his name as aforesaid shall be primâ facie evidence of his right to vote; and it shall be the duty of the election officers to stamp upon every tax receipt and every naturalization certificate produced as aforesaid, upon which a vote shall be received, the word "voted," together with the number and division of the ward, and the ✔date of the election, which stamp shall be evidence of the fact that such receipt or naturalization certificate was voted upon in the said ward and division at the said election.

Sects. 38–40. Punishment for fraud at extra assessments, &c.; officers to be qualified, and to have power to administer oaths, to register voters; form of tickets, meeting of election officers after election, &c.

Sect. 41. The councils to fix the amount of county tax to be assessed personally and annually on the qualified electors of the city, at a rate sufficient to provide for the payment of all election expenses in the city, and no part of the tax to be applied to any other purpose; the councils to appropriate annually a sufficient sum for the said purposes; the city commissioners to furnish all the books, blanks, stamps, stationery and materials necessary for the purposes of this act, to be paid for out of the appropriations to be made as aforesaid.

Sect. 42. The city commissioners to furnish to the board of aldermen, at their first meeting, 300 printed lists of the aldermen of the several wards of the city then in office, and the stationery and blank books that may be needed by the clerks of the board

[Patterson *v.* Barlow.]

in the performance of their duties. All votes taken upon any question shall be taken *viva voce*, the yeas and nays not to be called or taken in the board upon any resolution or question, nor shall the business of the board be retarded by dilatory motions, &c. The members, clerks and messengers of the board to receive $3 for each day's attendance; and the several division canvassers to receive $3 a day while engaged in the performance of their duties under this act.

Sect. 43. All laws relating to the assessment and collection of personal taxes and elections in the city of Philadelphia inconsistent with the provisions of this act repealed.

The case was heard before Sharswood, J., at Nisi Prius, on the 9th of June 1869, having been argued on behalf of the complainants only.

On the 19th of the same month Justice SHARSWOOD delivered the following opinion, and awarded the injunction prayed for.

"This bill alleges that the Act of Assembly, approved April 17th 1869, entitled 'An act further supplementary to the act relative to the elections of this Commonwealth,' is unconstitutional, and, therefore, void. If this is so, then previous decisions of the Supreme Court, the authority of which is binding upon me, have settled that the execution of it may and ought to be prevented by injunction: Moers *v.* Reading, 9 Harris 188; Sharpless *v.* The Mayor, Id. 147; Mott *v.* Pennsylvania Railroad Co., 6 Casey 9; Ewing *v.* Thompson, 7 Wright 379; Kerr *v.* Trego, 11 Id. 292; Page *v.* Allen *et al.*, 8 P. F. Smith 338. Although sitting as a single judge at Nisi Prius, I am undoubtedly bound to act according to my own conviction, under my oath to support the Constitution; yet upon a question of this character and magnitude, I would hesitate long before arresting the execution of an act of the legislature, if my decision could not be immediately brought before the Supreme Court by an appeal.

" In order 'that the general great and essential principles of liberty and free government may be recognised and unalterably established,' the people of this Commonwealth, in the 5th section of the 9th article of the Constitution, have declared 'that elections shall be free and equal.' To make it perfectly clear that this and the other provisions of that article—headed Declaration of Rights—were not intended as directory merely, but that they were to be applied and enforced by appropriate sanctions and remedies, they emphatically and solemnly add: 'To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government, and shall for ever remain inviolate.'

" It follows as a necessary consequence that any legislative act which destroys or impairs either the freedom or the equality of

elections is null and void. These words in the Declaration of Rights have certainly some meaning. They are not mere *brutum fulmen.* They were intended to prevent some wrong or wrongs, which might be attempted under the forms of law. They were useless else. It is the manifest duty of the judicial power so to construe them as to give them value and effect as an expression of the will of the people, made known in the highest exercise of their sovereignty, and paramount, therefore, to any act or resolution of the legislative, or any other department of the government.

"I propose to consider what was meant both by the freedom and the equality of elections, and then apply the declaration of the Constitution as thus interpreted to the Act of Assembly, the validity of which is now brought in question.

"By declaring that elections shall be equal, I think that it was evidently intended to provide that the regulations for conducting them should be uniform, and that no distinctions, especially as to the evidence required to prove the elective franchise, should ever be made between one class of citizens and another—between those residing in one place and those residing in another. If equality of elections does not mean this, it means nothing.

"The Constitution, in section 1 of article III., has defined with great accuracy those who shall enjoy the rights of electors. This definition of the elective franchise the legislature can neither enlarge nor abridge. Subject to this necessary limitation, they doubtless have the power to prescribe how the tribunals shall be constituted and chosen who shall receive and count the votes, and, of course, decide who are and who are not electors; the manner in which and the officers by whom persons may be qualified by the assessment and payment of a tax, and the evidence required of those who offer to vote to prove their qualifications.

"In all these respects, however, as it seems to me, in order that elections shall be equal, the regulations on this subject must be uniform throughout the Commonwealth. If the legislature should enact different rules as to different classes of persons claiming to vote, no one, I apprehend, would venture to contend that such elections were equal, or such laws constitutional. Put the case that it should be provided that professional gentlemen, clergymen, lawyers and physicians, should only be required to prove their qualifications by their own oath or affirmation, or by their word of honor, as British peers, and all other persons by the testimony of one or more witnesses on oath or affirmation, would any one, lawyer or layman, hesitate to pronounce elections so conducted to be unequal, and the provision therefore unconstitutional? On what conceivable principle can a distinction be drawn between such a case and that of an act establishing one rule for the people living in one election district, and a different one for those in

[Patterson *v.* Barlow.]

another——one rule for the people of the city of Philadelphia, and another for the people of the city of Pittsburg, and the other cities and counties of the state? I have faithfully endeavored to discover, but without success. It was a wise foresight in the framers of the fundamental law to declare that elections should be equal. What more likely to occur in the heat of political strife, which so often blinds the eyes of men to what is just and right in the pursuit of victory, than that a majority in power should attempt to maintain it by throwing embarrassments in the way of certain classes, whose sentiments they might know or fear to be adverse to them, to make the process of voting more troublesome, uncertain, dilatory or expensive to them than to others, or to accomplish the same unjustifiable results as to some particular section of country, to whose inhabitants they may have rendered themselves obnoxious? Even although the fact may be that no duly qualified elector is necessarily excluded from the exercise of the elective franchise, can the legislature make an invidious distinction between persons residing in one county and those residing in another any more than they can between different individuals? Indeed, the argument, if sound, must logically lead to the last inference. If the legislature can say that the rule for the people of Philadelphia shall be one, and that for the people of Pittsburg another, they can equally well say that the rule for John Doe shall be one, and for Richard Roe another. The Constitution has, therefore, as it appears to me, wisely ordained that election laws shall operate equally upon all citizens and upon all parts of the Commonwealth. It has said to the legislators:—— ' Whatever rules you establish in this matter, shall affect the rights of all your constituents alike. Although on other subjects you may adopt the policy of local legislation, on this most important one of elections, your laws shall be equal.'

" The violation of this fundamental article of the Declaration of Rights in the Act of April 17th 1869, now under consideration, is patent and undisguised. The first seventeen sections are general, and appear to provide for all parts of the Commonwealth. But the 18th section declares that ' None of the foregoing provisions of this act shall apply to the city of Philadelphia, excepting sections 12 and 13.' Sections 12 and 13 relate only to naturalization in court. The remaining sections, except the 19th, 20th and 38th, which are immaterial as to this question, apply exclusively to the city of Philadelphia. They establish an entirely different system. No one can deny that if this act goes into operation, we will have one code of election laws for the city of Philadelphia, and an entirely different one for all the other parts of the state.

" I do not pretend to say that there may not be some varieties of local legislation on this subject——looking to the convenience of ·

[Patterson v. Barlow.]

the citizens of different sections—such as are merely modal. For example, in some places additional officers may be necessary, and the time and mode of counting the votes and making returns may be different; so of the manner in which the tickets shall be voted, whether in separate ballots or otherwise—the times of opening and closing the polls, and other minor details of the same character. A different system is indeed absolutely required in the case of persons voting while in actual military service at a distance from their usual place of election, but this difference is specially authorized by the amendment of the Constitution of 1864. I do deny however that such differences as I shall now proceed to enumerate are of this modal character. I think the mere statement of them will be enough to show that they are material and fundamental—seriously affecting the rights of the electors—affording facilities in the one system which are not afforded in the other.

"1. By what I shall term the general system, meaning that provided for the state generally, the officers of the election are chosen as heretofore, by the electors of each election district. In Philadelphia they are to be appointed by a board composed of the aldermen of the city—persons chosen by the several wards for the performance of entirely different duties.

"2. By the general system the assessors are bound to assess all persons claiming that privilege at any time up to the tenth day before the election. In Philadelphia no assessment can be made after the 20th day of September in every year.

"3. By the general system the assessors are bound to assess all who claim a right to vote. In Philadelphia they are to assess only those who are qualified voters at the time of the assessment, and must annex their affidavit to the lists, that every person whose name is contained therein is a qualified elector, having a fixed residence in the division, to the best of their knowledge, information and belief.

"4. By the general system, a person whose name is not on the assessors' list, may prove his qualification on the day of election at the polls. In Philadelphia he is required to make such proof at least ten days before the election, and to a different tribunal—the division canvassers.

"5. By the general system, the claimant of a vote may prove his residence by any one qualified voter of the district. In Philadelphia he is required to make such proof, in addition to his own oath or affirmation, by the affidavit of two qualified voters of the division, whose names are contained in the assessors' division transcripts, under the head of private householders.

"6. By the general system, in order to prove payment of taxes, the tax receipt need not be produced, if the affiant shall state in his affidavit that it has been lost or destroyed, or that he never

10 P. F. SMITH—5

[Patterson *v.* Barlow.]

received any.  In Philadelphia, if his name is not on the original assessors' list, the tax receipt must be produced, and, in addition, proof made by satisfactory evidence, that the tax has been paid to the proper person authorized to receive it.

" 7. By the general system, the assessors are to place upon their list and assess all persons claiming a right to vote, without any regard to their condition or station in society.  In Philadelphia they are forbidden to assess originally any person boarding at any hotel, tavern, sailors' boarding-house or restaurant, or any person who has not a fixed residence in the district.

" 8. By the general system, the right of any person claiming to vote may be challenged at the polls, on the ground of non-residence, by any qualified voter.  In Philadelphia no voter whose name is registered can be challenged at the polls on any question of residence.

" 9. By the general system, persons of foreign birth, who have declared their intention to become citizens under the Act of Congress, and who design to be naturalized before the next election, may be assessed.  In Philadelphia no one not actually naturalized on or before the 20th of September can be assessed.

" I may be allowed to remark here, in passing, that the author of the general system seems accidentally to have overlooked the fact that two classes of persons of foreign birth might become citizens before the election by naturalization, without having declared their intention, viz. : minors who arrived in the country under eighteen years, and soldiers honorably discharged from service in the army of the United States.

" 10. By the general system, the assessment on the person can only be of a personal tax under the Act of Assembly of April 15th 1834, § 4, Pamph. L. 522, which heretofore in this city, and, I believe, elsewhere throughout the state, has been put at 25 cents.  In Philadelphia there is a special election tax of 50 cents imposed on each voter when the original division transcripts are made out (§ 27), and when the extra assessments are made (§ 28) without regard to the fact that the personal tax may have been previously assessed and even paid.  I have myself already been assessed for the year 1869, and have paid a personal tax of 25 cents.  If I read this act aright, the assessors are bound to impose upon me an additional tax of 50 cents.  I see no reason why this extra personal tax on the voters of Philadelphia might not be 50 dollars as well as 50 cents.

" There are other differences which have not escaped my notice, but it would extend this opinion unnecessarily to advert to them. The particulars enumerated make it, I think, sufficiently plain that the Act of Assembly of April 17th 1869, establishes two systems of laws for conducting and regulating elections, materially and fundamentally different, and if the position hereinbefore

assumed be sound, that the Declaration of Rights in ordaining that elections shall be equal, means that the laws upon this subject shall operate equally and uniformly upon all classes of citizens and upon all parts of the state, then this act is unconstitutional.

"But elections are to be free as well as equal. By the freedom of elections I understand not only that the voters shall have free access to the polls, in order to exercise their franchise without intimidation, by threats or physical force, employed, in the language of the Act of July 2d 1839, § 110, Pamph. L. 543, 'to influence unduly or overawe any elector, or to prevent him from voting or restrain the freedom of choice,' but also that full and free opportunity shall be afforded to every person who is able to do so, to obtain the qualifications made requisite by the provisions of the Constitution, in order that he may enjoy the rights of an elector, and that no regulations shall be enacted whose object or tendency shall be to impair or unnecessarily embarrass such acquisition, much less under the pretence of regulation to prevent it altogether. I will not stop to prove this proposition; to my mind it is self-evident. It would be in vain for the Constitution to declare that all persons who have complied with certain prerequisites shall enjoy the right of electors, if the legislature can by law exclude them practically from such compliance.

"The sections of the Act of April 17th 1869 which relate to the city of Philadelphia, do this effectively as to a large class of persons, though whether large or small matters not. The 1st section of the 3d article of the Constitution, in declaring that, 'in elections by the citizens, every white freeman of the age of twenty-one years, having within two years paid a state or county tax, which shall have been assessed at least ten days before the election, shall enjoy the rights of an elector,' provides in effect that every such citizen shall have a period of time up to ten days before the election to procure himself to be assessed. If the legislature cannot directly enlarge or abridge this time, neither can they indirectly accomplish the same thing by appointing a different day for the closing of assessments. By the 28th section of the Act of April 17th 1869, it is expressly enacted, that 'no extra assessments shall be made in said city after the 20th day of September in any year.' This day, so determined positively as the last day upon which assessments can be made, must be seventeen, and may be twenty-three days before the second Tuesday of October. Thus the space of time allowed by the Constitution for assessment, has been manifestly abridged from seven to thirteen days. If it is competent to the legislature to do this, they might with equal show of right, enact that all assessments shall close six months before the election, and thus practically return to the Constitution of 1790, in disregard of the amendment of 1839. This is as effectually to override and trample upon the fundamen-

[Patterson *v.* Barlow.]

tal law, as if they had undertaken to alter it in terms.    It will be seen at once, that all those who from sickness or temporary absence from home, want of knowledge, or other circumstances, have not been able to make personal application to be assessed on or before the 20th of September, are precluded from the exercise of the elective franchise, unless it should happen that they have been assessed at some previous period.    It cannot help a person to attend before the division canvassers on the tenth day before the election, for they have no power to assess a tax; nor can they, by the express words of the act, place his name on the list unless he shall produce a receipt for the payment of a state or county tax, assessed agreeably to the Constitution.

"The argument for the unconstitutionality of the act might well be closed at this point.    But there are some other provisions which I think ought to be particularly noticed.

"In making out the original division transcripts before the 1st day in June in every year, the assessors are required to classify the electors, under the following heads, to wit: 1. Private householders.    2. Private residents (which I suppose includes boarders at private boarding-houses).    3. Keepers of hotels, taverns, sailors' boarding-houses or restaurants.    'In making out the said lists, the assessors shall not place thereon the name of any person boarding at any hotel, tavern, sailors' boarding-house or restaurant, or the name of any person who is not a qualified elector, having a fixed residence in the division.'    After this positive prohibition, we would naturally expect to find somewhere as positive a direction to place the names of these persons on the extra assessment list, or the list of the division canvassers, upon their personal application, and making their qualification to appear. The Constitution certainly does not exclude them.    It does not require a fixed residence, whatever may be the meaning of that term.    Admit, however, that they have the right to be placed on these subsequent lists, under the general words of the act, what is the evidence which they, as well as all others whose names are designedly or accidentally omitted from the division transcripts, are required to produce?    In addition to his own oath or affirmation, the claimant must prove by the affidavit of two qualified electors of the division, whose names are contained on the assessors' division transcripts, under the head of private householders, that he is a bonâ fide resident of the division, and that they verily believe that he will be a qualified voter, entitled to vote in the said division at the next general election.    Sections 28, 31, 33. Thus, not only boarders at hotels, taverns, sailors' boarding-houses and restaurants, who must make this proof, but residents with private householders, their sons, other relations, friends and servants, and also boarders in private boarding-houses, whose names may be designedly or accidentally omitted, have this unusual,

[Patterson *v.* Barlow.]

invidious and burdensome kind of evidence cast upon them. They cannot avail themselves of the testimony of their fellow-boarders, or even of the keeper or clerk of the hotel, but they must be able to secure the evidence of two private householders, who must reside in the division, and their names must be on the assessors' division transcripts, under the head of private householders, and they must be willing to depose on oath or affirmation, from their own knowledge, that the claimant is a bonâ fide resident of the division, and, moreover, that they verily believe that he will be a qualified voter, entitled to vote in the said division at the next general election. The class upon whom this invidious burden is laid is large and respectable, comprehending journeymen mechanics, clerks in banks, insurance offices, and other corporations, as well as in stores and manufactories, and unmarried workmen in all kinds of employment, who are usually boarders in some shape or other. Practically, numbers will find it very difficult, if not impossible, to fulfil these conditions. No such requirement is made in any other part of the state, not in Pittsburg, nor in any other large city. There the testimony of one qualified elector is sufficient, whether he be a resident in the division or elsewhere, and that at the polls on the day of election, when of course the witness will not be required to vouch his belief in the existence of a qualification *in futuro*. But even if one of this unfortunate class of persons—being a private resident, or boarder at a private boarding-house—finds his name on the division transcript list, he is not safe. The division canvassers, at their session, on the tenth day before the election, or at any adjourned session to be held on the eighth day, may, in his absence, and without notice to him, strike his name from the list by drawing a line in red ink through the same, upon the testimony of two reputable citizens, qualified voters of the division, whose names appear on the said transcript, under the head of private householders, to be given under oath or affirmation, that such person is not a resident of the division, or is otherwise disqualified by law from voting at the said election (section 35). If he has procured himself to be placed on the extra assessment list by the production of the extraordinary evidence required for that, he is still at the mercy of the district canvassers, who, in his absence, and without notice, yes, and without evidence, may strike his name from the list. 'The said canvassers shall also examine and revise the extra assessment books of their respective divisions, and shall strike therefrom the names of all persons who are not residing in the division on the tenth day before the election.' (Section 35.) Is it necessary to do more than simply recite these provisions? Need I add that, in my judgment they are unreasonable, contrary to the first dictates of natural justice, and unconstitutional, because they unnecessarily embarrass and prevent the citizen from that free and full oppor-

[*Patterson v.* Barlow.]

tunity of qualifying himself for the exercise of the elective franchise, which the Constitution guarantees to him?

"After all the complicated machinery which has been constructed in order to make up the final list of voters; the original assessors' division transcript prior to June; the board of aldermen; the extra assessment between the 1st and 20th days of September, for five consecutive days, to be appointed by that board; the division canvassers, with their revision of the list, on the tenth and eighth days before the election; it is still perhaps a question upon the construction of the act, whether a duly qualified elector, whose name is not on the registry, may or may not prove his qualification to the election officers, and vote at the polls. In the 4th section, which relates to the other parts of the state, it is expressly declared that on the day of election any person whose name is not on the assessors' list may prove his qualification, and be admitted to vote. The evidence which he is required to produce is particularly described. There is no such provision in the sections which relate to Philadelphia. The evidence, which shall be necessary before the assessors and the division canvassers, is carefully specified, as we have seen; but there is not a word as to what shall be the evidence at the polls to the election officers, except the list and some things required in addition to it—production of tax receipts with proof of identity, and of certificates of naturalization without proof of identity. It may perhaps be argued that, inasmuch as he is not expressly excluded, a qualified voter whose name is not on the list will still have a right to vote, on giving the evidence prescribed by the General Election Law of July 2d 1839, § 66, Pamph. L. 534, which in this respect is not inconsistent with the provisions of this act, and therefore is not repealed. But this would present a very gross incongruity; that two witnesses, and of a very special character, shall be required to place a name on the list in advance, while at the polls the same thing can be done by the testimony of one competent witness, who is a qualified elector, and who need not be a resident of the division. I conclude, therefore, that when it is declared in the 36th section, that the list when finally completed by the division canvassers, 'shall constitute the registry of citizens qualified to vote in the said divisions respectively at the next general election' (section 30), it is an affirmative necessarily pregnant with a negative. If this be the true construction of the act, then my settled conviction is that on that ground alone it is unconstitutional. Election-day is the proper time to prove the qualifications of an elector, if required by an inspector, or challenged by a citizen; for, from the very nature of the facts which make up the qualifications, they cannot be proved before. Residence in the state one year, and in the election district ten days, both periods of time to be immediately preceding the election, are past facts only complete

[Patterson v. Barlow.]

and susceptible of proof then.   No previous proof can anticipate and take the place of it.   It is enough to say, that the Constitution does not require the elector to have the constant intention of continued residence in the state during the year, or in the district during the ten days.   At the commencement of and during all that term, he may intend to remove, and yet in fact continue to reside in the same place.   If he removes from one district to another during the ten days, he can neither vote in the old nor the new district.   He loses his vote.   A legislative attempt to remedy this by the joint resolution of April 26th 1844, Pamph. L. 605, was very properly decided to be unconstitutional in Ewing's Case, Q. S., Philadelphia, July 22d 1862, MS.   Although a person may have truly sworn ten days before, that it was then his intention to continue his residence in the district until the day of election, he may change his mind and remove the next day. His witnesses may depose, with great sincerity, that they verily believe that on election-day he will be a qualified voter, yet the result may show that they were mistaken in their belief.   On what principle can an elector, who proves on that day that he possesses every qualification prescribed by the Constitution, be deprived of his elective franchise because he has not proved before what, in the very nature of things, he could not prove before ?   Let us take, however, the case of one who, with every disposition to conform to the regulations which the legislature has made, has applied and been refused both by the assessors and the division canvassers, because, by the express provisions of the act, his name could not be placed on the list.   A citizen of foreign birth has been naturalized the day before the election.   He could not have been naturalized before, because his time had not expired.   He offers his vote to the election officers at the polls.   He is a citizen—a white freeman of the age of twenty-one years—has resided in the state for one year, and in the election district ten days preceding the election, and has paid within two years a state or county tax, assessed at least ten days before the election.   The tax may have been a personal one assessed upon him at the previous triennial assessment, or it may be upon property owned by him.   To reject such a vote is to deprive him of an undoubted right; it is to violate the Constitution, which says positively, imperatively, he shall enjoy the rights of an elector.   I need not add that if, in consequence of the prohibition contained in this act, he was not assessed ten days before the election, this system, which denies him that privilege, deprives him just as effectually by that means of his elective franchise as by rejecting his vote, if he had been fully qualified.

   " There is another matter which seems to need some explanation. After declaring, in the 36th section, that the final list shall constitute the registry of citizens qualified to vote, the act pro-

[Patterson *v.* Barlow.]

ceeds, 'provided, that if any person so registered shall cease to be a resident of the division before the election, he shall not be entitled to vote therein.' Yet the very next section enacts with equal positiveness that 'the said register shall be the only evidence that the persons whose names are found thereon have resided for ten days immediately preceding the said election in the said division, and no voter whose name is so registered shall be challenged at the polls on any question of residence.' I do not know how these two provisions are to be reconciled, or which is to give way, the first or the last, nor is it necessary now to consider that question. It will certainly be a very difficult one to decide, if it should ever arise. I do believe, however, after the fullest reflection, that an act of the legislature which makes a registry previously made up, conclusive evidence of the qualifications of all those whose names are on it, whether as to residence or anything else, is as contrary to the Constitution as an act which undertakes to exclude those whose names are not on it.

"On the whole, I am clearly of the opinion that the Act of Assembly, approved April 17th 1869, is unconstitutional. I have not felt it to be my duty to examine particularly the provisions applicable to the other parts of the state, since, as was held last year by the Supreme Court, in relation to the Act of April 4th 1868—because it undertakes to establish two different systems— the entire act, at least, so far as elections are concerned, except the first clause of the 40th section, must fall under the same condemnation. There may be, and appear to be, some sections in relation to other matters upon which I am not called to give any judgment. The 43d section, which repeals such other laws as are inconsistent with the provisions of the act, is, of course, to be construed to mean such provisions as are constitutional and have the force of laws. 'This conclusion,' as was said by Chief Justice Thompson, in Page *et al. v.* Allen *et al.,* 'leaves all the election laws in force which were intended to be superseded by this act.'"

The defendants appealed from the decree.

*C. Gibbons* and *Meredith*, for the appellants.—The plaintiffs have no standing. It is a public law, the plaintiffs are private citizens and have no more interest than the public generally; it appears by their bill and the act that it is impossible for them to sustain injury by the operation of the law. They must show private damage beyond the public at large: Georgetown *v.* Alexandria Canal Company, 12 Peters 91; Irwin *v.* Dixion, 9 How. 28; Sparhawk *v.* Union Passenger Railway, 4 P. F. Smith 401; Rhodes *v.* Dunbar, 7 Id. 274. The same rule applies to a quo warranto: Murphy *v.* Bank, 8 Harris 415; Burrell's Case, 7 Barr 34; Commonwealth *v.* Farmers' Bank, 2 Grant 392. In Sharp-

[Patterson v. Barlow.]

less v. Philadelphia, 9 Harris 147, the act was not a public or political law.

The court has not jurisdiction.   Regulating elections belongs to the legislature: Charter of 1683; Constitution of 1776, § 18, 24, 31; Constitution of 1790.   Such power would have enabled judges to prevent elections by setting aside the laws at pleasure.   The Bill of Rights of 1776, Article 6, provides against legislative or executive oppression.   The schedule to the amendments of 1838 continued laws in force, and the exclusive right of the legislature to regulate elections was perpetuated.

If the court can restrain the operation of a political law, they can enjoin the legislature from passing it: Mississippi v. Johnson, 4 Wallace 475.

The law is constitutional.   It does not contravene the principle that " all elections shall be free and equal."   This does not mean that all elections shall be uniform.   " Free" here means without unlawful obstruction, intimidation or corruption : Laws agreed on in England 1682, 2 Proud's Hist. of Penna., Appendix 15, § 3 ; Laws passed at Chester July 7th 1862, Hazard's Annals 633, § 66 ; Bill of Rights 1776, § 7; Constitution of 1776, § 17, 18, 32 (" Conventions of Penna." 56, 62); 2 Dallas' Laws 351, § 26, 27 ; Charter of 1683, Article 16, Conventions of Penna., p. 23, § 16 note ; Constitution of 1790, § 5.   In the convention of 1838 it was attempted to prevent restrictions in Philadelphia from being different from other parts of the state, but it was refused by a vote of 69 to 42.   On the principle contended for nearly all the election laws beginning with 1785 have been and are unconstitutional. The Act of 1785 limits the Northern Liberties to one inspector whilst there were two elsewhere ; voters in Bedford county when absent attending court, might vote at the court-house ; polls were to remain open longer in Philadelphia than elsewhere ; in the counties of Westmoreland, Washington and Fayette voters having taken the oath of allegiance in Virginia might vote without taking the test oath as required from others ; judges of election shall be appointed by justices of the peace.   Act of 1786, § 6, 2 Dallas' Laws, p. 459, allowed special privileges, as to voting, to clergymen, mechanics, manufacturers and schoolmasters.   A registry law is constitutional: Page v. Allen, 8 P. F. Smith 338.

C. J. Tilghman suggested a registry law : Catlin v. Smith, 2 S. & R. 269.

H. M. Phillips and W. L. Hirst (with whom was G. W. Biddle).—It may be added to the grounds stated in the opinion of Judge Sharswood, that the act subverts the organic provisions of the Constitution relating to the legislative department of the government.   The amendment of 1857 provides that representatives to the

[Patterson *v.* Barlow.]

number of one hundred shall be apportioned and distributed equally throughout the state by districts in proportion to the number of " *taxable inhabitants*," in the several parts thereof. The senate is founded on the same basis of representation. The recent Registry Act excludes all but " *qualified voters*" from the assessment lists, and in effect strikes out from the Constitution the words taxable inhabitants, and substitutes qualified voters, a class less numerous, and thus reduces the representation due to Philadelphia. The assessment laws have recognised the distinction, requiring assessors to assess all " *white freemen*," Purdon, page 371, pl. 12; page 392, pl. 191; and the city assessors are regulated accordingly: Purdon, page 944, pl. 94 and 97. The city councils' are constituted on the same basis in the Consolidation Act, § 2.

The opinion of the court was delivered, July 7th 1869, by
AGNEW, J.—We regret that the necessity for an immediate decision in this case has allowed so short a time for the preparation of our opinion; and that the public character of the questions demands a treatment too full to be compatible with brevity.

The plaintiffs are private citizens, electors of the Commonwealth, tax-payers, and holders of real estate in the city of Philadelphia. By their bill they ask us to declare illegal and void an Act of the General Assembly passed the 17th of April 1869, supplementary to the election laws of the Commonwealth; and to enjoin the councils, aldermen, commissioners, controller, and treasurer of the city from carrying its provisions into effect. The defendants deny the standing of the plaintiffs as proper parties, and the jurisdiction of the court over the subject. In view of the danger to the peace and quiet of the people, if the constitutionality of this law should be left in uncertainty, we shall pass by the questions of standing and jurisdiction, in order to reach the all-important one upon the validity of the law. In passing them by, we do not mean it to be inferred that we have not grave doubts of the right of the plaintiffs to represent the public, and of our own jurisdiction to enjoin against one of the political systems of the state in its entire scope, because of the invalidity of some of its provisions. We doubt the right of the plaintiffs to call for an injunction beyond that portion of the law, which they, as private citizens, can show to be injurious to their own rights; and it is more than doubtful how far as private citizens they can impugn the law in its public aspects, and ask us to restrain its execution on public grounds. This is the only system to regulate elections intended by the legislature to be left in force; all laws supplied by it and all inconsistent with it being expressly repealed. If as a court of equity we can lay our hands on the whole system because of the illegality of some of its parts, we can, on the eve of any election, arrest the entire political machinery of the Commonwealth, which

is set in motion by a general election. This is a stupendous power; and to see its true aspect we have only to suppose the Act of 1839 and its supplements to be still in force, and that this bill is filed to enjoin against it on the ground of the alleged illegality of some of its provisions. As a question of power, we would have the same right to enjoin against it, and thus to stop the wheels of government. See The State of Mississippi v. Andrew Johnson, 4 Wallace 475.

We come now to the important question whether the Act of 17th April last, called the Registry Law, is constitutional. It is admitted that the Constitution cannot execute itself, and that the power to regulate elections is a legislative one, which has always been exercised by the General Assembly since the foundation of the government. The Constitution appoints the time of the general election, prescribes the qualifications of voters, and enjoins the ballot; and for all the rest the law must provide. The precincts and places, the boards of election, the lists of the electors, whether called a list of taxables or a register of voters; and the evidence of persons and qualifications must all be prescribed by law. This undoubted legislative power is left by the Constitution to a discretion unfettered by rule or proviso, save the single injunction "that elections shall be free and equal." But to whom are the elections free? They are free only to the *qualified* electors of the Commonwealth. Clearly they are *not* free to the unqualified. There must be a means of distinguishing the qualified from the unqualified, and this can be done only by a tribunal to decide, and by evidence upon which a decision can be made. The Constitution does not provide these, and therefore the legislature must establish the tribunal, and the means of ascertaining who are and who are not the qualified electors; and must designate the evidence which shall identify and prove to this tribunal the persons and the qualifications of the electors. How shall elections be made equal? Clearly by laws which shall arrange all the qualified electors into suitable districts, and make their votes equally potent in the election; so that some shall not have more votes than others, and that all shall have an equal share in filling the offices of the Commonwealth. But how shall this freedom and equality be secured? The Constitution has given no rule and furnished no guide. It has not said that the regulations to effect this shall be uniform. It has simply enjoined the duty and left the means of accomplishment to the legislature. The discretion, therefore, belongs to the General Assembly, is a sound one, and cannot be reviewed by any other department of the government, except in a case of plain, palpable and clear abuse of the power which actually infringes the rights of the electors. It is not possible, nor does the Constitution require, that this freedom and equality of election shall be a perfect one.

[Patterson *v.* Barlow.]

No human law, affected as it must be by obstacles and a difference of circumstances, can devise a system of perfect equality— it can only approximate it, and mere errors in the execution of the power cannot make the execution unconstitutional.   Individuals may experience difficulties, and some may even lose their suffrages by the imperfection of the system; but this is no ground to pronounce a law unconstitutional, unless it is a clear and palpable abuse of the power in its exercise.   Then that election is free and equal where all of the qualified electors of the precinct are carefully distinguished from the unqualified, and are protected in the right to deposit their ballots in safety, and unprejudiced by fraud.   That election is not free and equal where the true electors are not separated from the false; where the ballot is not deposited in safety, or where it is supplanted by fraud.   It is, therefore, the duty of the legislature to secure freedom and equality by such regulations as will exclude the unqualified, and allow the qualified only to vote.   A free and equal election is the end, regulations to attain it are the means.   If the end be attained, it is evident no question of constitutional law can arise on the uniformity or diversity of the regulations by which the end is reached.   Of necessity, laws passed to promote a given object, must be controlled or modified by the circumstances surrounding the object, and must be framed to meet the exigencies standing in the way of the end to be reached.   If uniformity of regulation be unsuited to different localities, the end must be attained by diversity.   If in one part of the state a system secures to electors a free and equal election, but fails to secure it in another part because of the difference of circumstances, what principle of constitutional law makes it unlawful to enact other provisions to counteract the circumstances, and secure the true purpose of the Constitution?   Good sense, good order and sound morality require this diversity of regulation when it secures the end; and it is a great fallacy to substitute uniformity of regulation for a free and equal election.

This is not a new question.   A registry law for the city and county of Philadelphia was passed on the 16th day of June 1836. The list of voters corrected and certified on the first Tuesday of October, one week before the election, was made "*the only and conclusive evidence of the qualifications of the electors thereof, except in the cases of naturalization hereinbefore mentioned.*"

No attempt was ever made to question the constitutionality of the Registry Law of 1836, though enacted under the provision of the Constitution of 1790 now in force.   It was in force when the Convention to amend the Constitution sat in 1837–8, and entered largely into its discussions.   The attention of the convention was thoroughly aroused to it.   In committee of the whole on the report of the committee on the 9th article, Mr. Sterigere,

of Montgomery, moved to amend the 5th section by adding a provision for *uniformity* in the regulations for elections. It was voted down, and when the report came up on second reading, Mr. Sterigere again offered it.     The amendment will be found on the 249th page of the 11th vol. of the Debates of the Convention, in these words: "The 5th section being under consideration, which reads in words following, viz., *Sect. 5. That elections shall be free and equal,* Mr. Sterigere, of Montgomery, moved to amend the said section by adding to the end thereof the words as follow, viz.: *The election laws shall be uniform throughout the state, and no greater or other restrictions shall be imposed on the electors in any city, county or district than are imposed on the electors of every other city, county or district.*"

Mr. Sterigere stated that this amendment was offered in committee of the whole, and was rejected by a small majority. John M. Scott, of the city of Philadelphia, said this amendment was fully discussed in the committee of the whole. It should be understood, he said, *that its effect would be to destroy the Registry Law in the city and county of Philadelphia.* Mr. Charles Brown, of the county of Philadelphia, said he knew no reason why the law should be different in one part of the state from what it is in another.     The previous question was then called, cutting off the amendment, and was sustained by a vote of 69 to 42, a number of the political friends of Mr. Sterigere and Mr. Brown voting in the majority.     Thus the 5th section of the 9th article was left as it stood in the Constitution of 1790, to wit: "That elections shall be free and equal."     This was no party vote, the relative strength of parties in the Convention being 67 and 66, and should put an end to all argument on the constitutionality of a registry law.

The question of uniformity of regulation was conclusively settled by this vote.     The very purpose of the amendment of Mr. Sterigere was to destroy the Registry Law then existing under the identical provision in the Constitution of 1790, that elections shall be free and equal.     This purpose was brought directly to view by Mr. Scott, and the Convention by this vote decided against uniformity of regulation and against imposing restrictions upon the legislative power.

Last year the question upon the power of the legislature to pass a registry law was brought before this court in the case of Page *et al. v.* Allen *et al.*, 8 P. F. Smith 338, and a majority of the court (composed of Justices Strong, Read and myself), held that the power existed; but Justice Strong thought the Act of 1868 unconstitutional in a single but essential particular, by requiring proof of a residence in the district longer than the constitutional period of ten days.     *That* law was therefore held to be unconstitutional by a majority, Justice Read and I dissenting. The decision, therefore, has no bearing on the general question.

[Patterson *v.* Barlow.]

That a registry law to identify and distinguish the true electors is constitutional we cannot doubt, and that uniform regulations are not enjoined by the Constitution is beyond all dispute.

But is there a necessity for local legislation requiring provisions adapted to the city of Philadelphia, not suitable to other parts of the state? If not, why is a city charter granted with all its large powers of local government, its special provisions for police and for conduct? Where population greatly abounds vice and virtue have their greatest extremes. A simple rural population needs no night police, and no lock-up. Rogues and strumpets do not nightly traverse the deserted highways of the farmer. Low inns, restaurants, sailors' boarding-houses, and houses of ill fame do not abound in rural precincts, ready to pour out on election day their pestilent hordes of imported bullies and vagabonds, and to cast them multiplied upon the polls as voters. In large cities such things exist, and its proper population therefore needs greater protection, and local legislation must come to their relief. The freedom and equality of the ballot-box must be protected from the local causes which mar and destroy a free and equal election. What crime have the freemen of Philadelphia committed, that their voice at the ballot-box may be stifled by the fraud or force which springs out of their local circumstances, and yet the legislature be powerless to relieve them? In the language of another, that would be " to place the vicious vagrant, the wandering Arabs, the Tartar hordes of our large cities, on a level with the virtuous and good man—on a level with the industrious, the poor and the rich." Is that a wise and just interpretation of the Constitution which opens the polls of a large city to such imported hirelings and vagabonds without a home, by adhering to a uniformity of regulation unsuited to the city on the one hand, or to the country on the other? Is the Constitution of Pennsylvania so deformed and sterile that her laws cannot protect the ballot-box of a city from falsehood and fraud because they admit of but one unbroken system for the state? Such an interpretation of the Constitution is wanting in merit, and can only operate as an incentive to fraud. How then can the freedom and equality of election be secured in a great city if from the force of local circumstances the places of the real electors are usurped, if the ballot-box can be stuffed with impunity, or if suffrage can be exercised only at the risk of violence or life?

Thus the ground on which this case was placed at Nisi Prius is swept away, the postulate of the learned judge being that uniformity of regulation throughout the state is a demand of the Constitution, as the equivalent of equality of election. But when it is shown that the Constitution nowhere demands uniform regulations, and, on the contrary, that the very equality of elections demands a difference in regulation to overcome the obstacles to

[Patterson v. Barlow.]

equality and fairness existing in the city, his fundamental position is overturned, and with it the entire argument built upon it. Then of what service is it to display the differences in this law, between the regulations made for the city and those for the state? Let them be ten or ten times ten, it is not their difference which proves their unconstitutionality—difference of regulation is not want of equality in the election. He who would prove them to be unlawful, must show wherein they subvert the rights of the electors themselves. If the prevalence of fraud, corruption, or force in the city makes the law more rigid and exacting in order to determine the rights of the lawful electors, it may be a hardship; but it is not caused by the law, but by the crimes which make the law necessary for their protection.

When the legislature possesses an undoubted authority to regulate, such as in this case, its discretion is not the subject of review. This is expressed by Black, C. J., in Sharpless v. Philadelphia, 9 Harris 147, in these words: "There is another rule which must govern in cases like this; namely, that we can declare an Act of Assembly void only when it violates the Constitution *clearly, palpably, plainly,* and in such manner as to leave *no doubt* or hesitation in our minds. This principle is asserted by judges of every grade, both in the Federal and in the state courts; and by some of them it is expressed with much solemnity of language." He refers then to 6 Cranch 87; 4 Dall. 14; 13 S. & R. 178; 12 Id. 339; 4 Binn. 123. See also the opinion of Sharswood, J., in Commonwealth v. Green, 8 P. F. Smith 226.

We come now to the question, What provisions of this law for the regulation of the city elections, if any, are subversive of the rights of city electors? The number of these objected to is few, after having disposed of the difference between city and state regulations. Much stress has been laid on the right of the people to elect the officers of the elections; and much said upon popular rights which might well be addressed to the legislature in making or reforming the law. But, unfortunately for the argument, the people have by their Constitution disposed of all such appeals when addressed to us. What clause of the Constitution forbids the officers of the election, the canvassers, or even the assessors, to be appointed by a board constituted by law, whether it be a board of aldermen or a board of commissioners? Let the Constitution itself answer, Art. 6 and 8: "All officers whose election or appointment is not provided for in this Constitution shall be elected or appointed as shall be directed by law." Here there is a law made under the direct sanction of the people themselves, expressly given in the Constitution. But it is said the law is unconstitutional because the board of appointment in this case (the aldermen) have a majority in it of persons belonging to a particular political party, and the argument omitted to say a

[Patterson *v.* Barlow.]

majority which is the result of popular elections. This ground of unconstitutionality of law because a board created by it is composed of individuals of different political opinions, with a majority in a certain way the result of popular elections, seems to belong to an age fruitful in discovery. How is it possible that any board composed of men can be organized without a majority in political opinion in one way or another? To the party in the minority such a board must always be unconstitutional if such arguments were to prevail.

But clearly it is not unconstitutional and not unfair to designate a board of gentlemen chosen by the people to administer the laws among them. If these men be unfit agents it is not the fault of the legislature, but of a people who will elect such men to administer justice to themselves. The law binds the board of aldermen to appoint the officers of the election, so that the political party having a majority in the election division shall have a majority of the board. It requires the canvassers to be appointed so that each party will be represented in the several boards of canvassers, adding a supervising power in the courts to correct errors. What fair mind can pronounce this an *abuse* of legislative power, so gross, so palpable and so plain as to become an unconstitutional act? Said Chief Justice Marshall: "All power may be abused, and if the fear of its abuse is to constitute an argument against its existence, it might be urged against the existence of that which is universally acknowledged, and which is indispensable to general safety:" Brown *v.* Maryland, 12 Wheat. 441. The argument that the aldermen being judicial officers cannot be compelled to act, is of no weight, and was so regarded by the whole court in Page *et al. v.* Allen *et al.*, decided last year. The position would overturn our own acts as judges in the appointment of prison, penitentiary and building inspectors, commissioners to take testimony and other officers. The practice is sanctioned by a century of use. The lower courts fill all vacancies in county and township offices, such as commissioners, auditors, surveyors, district attorneys, constables, supervisors and overseers of the poor. The associate judges constituted a part of the military boards under the bounty and provision laws, and the boards for the revision of taxes; and the judges of the judicial districts appointed the revenue commissioners. Besides the aldermen have not refused, and it is not likely they will refuse, and what authority have these plaintiffs to gainsay their right to act, or to put in a refusal on their behalf? The truth is the whole weight of this objection consists in the fact that the majority of the board, representing the popular majority, hold opposite opinions to the plaintiffs, and when a new deal of the popular cards turns up a different majority, I suppose gentlemen of the opposite party will use the same argument.

The next objection urged, with equal, and perhaps greater

[Patterson v. Barlow.]

zeal, is that there is no provision for assessing persons in the city after the 20th of September. The purpose of this regulation is obvious—it is to cut off the unqualified persons who are imported into the districts to displace the votes of the true electors; by taking a period for the extra assessment sufficiently distant from the day of election, to render it inconvenient and difficult for these hirelings to obtain a false qualification. But what clause of the Constitution requires the assessment of taxes to be extended to any period? It is a new discovery that the system of taxation must be subordinated to that of election. Neither the Constitution of 1790 nor that of 1838 prescribes any time for the exercise of the powers of taxation, though both use the *payment* of tax within two years as the means of distinguishing the true elector and as evidence of his residence and membership in the community. It is a great error in constitutional law to mistake a restriction for an injunction. When the Constitution provides that the elector shall have paid *within two years* a state or county tax, which shall have been assessed *at least* ten days before the election, its purpose was to restrain the assessment so that voters might not be fraudulently made at the very polls; but it did not require the tax power to be altered so that assessments should be compulsory down to the tenth day before the election. There is no express injunction, and it is not even a fair implication. The rights of the true electors were well protected when they were allowed two years preceding for the *payment* of a tax to secure their qualification, a period including certainly two, and it might be three annual assessments. To this the law adds an *extra* assessment at any time before the 20th of September. The time of the assessment of taxes is part of a different system, that of taxation; and the Constitution has nowhere said it is to be subordinated to the system of election. This time belongs to the sound discretion of the legislature, and should be regulated with a regard to what they believe the best interests of the citizens. If the Assembly believe that the best means to prevent frauds in the city elections is to increase the period for the last assessment, it may be done, the only constitutional provision being the *restriction* that the time shall not be *less* than ten days before the election.

The alleged double taxation scarcely deserves notice. The system of *annual* taxation has marked the whole history of the government. He whose name is on the annual list to whom a tax is assessed, is clearly not to be listed a second time for *taxation*. He is to be listed for the election. The first list of electors is to be made before the 1st of June, and being made by the same officers is evidently intended to be made in connection with the original assessment. If an elector has been already taxed, his tax will be transferred to the list of electors, if not, the tax will then be assessed in order to perfect his qualification as a voter.

10 P. F. Smith—6

[Patterson *v.* Barlow.]

When the law is so easily harmonized it is a forced construction which exacts a second tax from one whose name is on the original list. The *extra* assessments on the subsequent lists are evidently required to perfect the elector's qualifications.

It is argued that the provision of this act which requires the assessors to omit from their lists all boarders at hotels, taverns, sailors' boarding-houses and restaurants, and all persons not qualified electors having a fixed residence in the division, is unconstitutional. It is said that a large class of electors is thus excluded from the list. This is a palpable error. The law forbids the assessors to take down the names of such persons, to prevent the frauds known to result from taking down lists of persons given in as boarders, when no such persons are residing at the hotel or boarding-house. But it nowhere forbids these omitted persons from being placed on the registry at the proper time, and on proper evidence. On the contrary, a mode is provided to enable every lawful elector to be registered, by application to the assessors or to the canvassers. Clearly the feature complained of is a useful provision to protect the rights of the true electors of Philadelphia, and to reach the unqualified persons found at such convenient places just upon the eve of an election, when their votes are needed by unscrupulous men. Its purpose is to exclude this fraudulent element, by compelling all persons not known householders and fixed inhabitants to come personally before the proper board and make proof of their right. True, the omission demands of single men, clerks, journeymen and transient boarders, a greater vigilance to secure their suffrage. But the demand is not imposed by the law, but by the necessity which required it, in order to protect them and all other honest electors from being supplanted by fraudulent voters.

What clause of the Constitution forbids this power to be exercised according to the exigency of the circumstances? Where the population of a locality is constantly changing, and men are often unknown to their next-door neighbors; where a large number is floating upon the rivers and the sea, going and returning and incapable of identification; where low inns, restaurants and boarding-houses constantly afford the means of fraudulent additions to the lists of voters, what rule of sound reason or of constitutional law forbids the legislature from providing a means to distinguish the honest people of Philadelphia from the rogues and vagabonds who would usurp their places and rob them of their rights? I cannot understand the reasoning which would deny to the legislature this essential power to define the evidence which is necessary to distinguish the false from the true. The logic which disputes the power to prohibit masqueraders in elections, on the ground that it affects their freedom or equality, must also deny the power to repress the social disorders of a city, because the same Bill of

[Patterson v. Barlow.]

Rights declares that all men are free and equal and independent and have the right of pursuing their happiness. The power to legislate on the subject of elections, to provide the boards of officers, and to determine their duties, carries with it the power to prescribe the evidence of the identity and the qualifications of the voters. The error is in assuming that the true electors are excluded, because they may omit to avail themselves of the means of proving their identity and their qualifications. It might as well be argued that the old law was unconstitutional because it required a naturalized citizen to produce his certificate of the fact, and expressly forbade his vote if he did not. What injustice is done to the real electors, by making up the lists so that all persons without fixed residences shall be required to appear in person and make proof of their residence, and thus to furnish a true record of the qualified electors within the district?

In connection with this subject another feature is mentioned as a hardship—requiring the proof of residence by two witnesses, who must be householders and electors. But hardship is not the test of the constitutionality of a law. This case is no harder than the law which requires a will to be proven by two witnesses, before a man can exercise his more precious right of disposing of his property among his children, when he comes to die. Both laws have the same purpose—protection. One would protect electors against fraudulent voters; the other would protect the dying man against a fraudulent will.

Another complaint is made of unconstitutionality, on the ground that the canvassers are required to strike off the list the names of all *unqualified* persons, if upon *due* inquiry and investigation they shall find them to be *unqualified;* but, in the absence of the person, they can only do this on the testimony of at least two reputable citizens, who are private householders. The argument is, that the law is unconstitutional, because the canvassers might abuse their powers. They are not permitted to strike off any qualified voter, and if they do, he has his remedy at law to compel them to restore his name. The canvassers are a legal tribunal established to decide on evidence of qualification, are sworn officers, and are required to proceed in a due and proper mode, and decide on sufficient evidence. But a law can be pronounced unconstitutional only when the law itself subverts the true electors' rights, and not because the tribunal acting under it may make mistakes, or even abuse its functions. All tribunals of every kind could be set aside upon such an argument. The language of Chief Justice Marshall may be again referred to on this point.

Another ground much urged is, that the proper time for the proof of the qualifications of electors is the day of the election, for then only, it is said, the period of residence is complete; and from the nature of the facts this cannot be shown before. Grant it;

[Patterson *v.* Barlow.]

but this position is taken in mistake of the very law before us. By this law, it is on that day—the election-day—the election board sits to receive the vote and the proof—then the elector appears before them and proves his franchise; then the evidence is produced, and the decision made upon it. But what clause in the Constitution forbids the means to be provided beforehand which furnishes evidence of the fact? What clause forbids the making up of a record ten days before, that shows that the person offering his vote to the board was *an actual* resident of the precinct ten days before; and was then set down as entitled to claim his privilege on the day of election? Why is such a record not good evidence that his residence actually began in the district, or pre-existed there ten days before the election? It certainly does not diminish the true elector's right; but on the contrary tends to secure it. It is better evidence than the testimony of some irresponsible and base perjurer, brought to prove a false residence at some low boarding-place. The record has the merit of truthfulness, and it relieves the true and honest elector of those unfounded and malicious objections to his vote made by partisans of either side. Here is the legal proof that his residence in the district began in the due constitutional time. What better proof can there well be of a residence complete on the day of election, than the personal appearance of the elector on that day claiming his vote, with his ballot in one hand and the register in the other? It is good evidence, for the legal presumption arising from such proof is violent.

But it is unnecessary to discuss this subject at greater length. The want of time to condense the argument has made this opinion already too long. Enough has been said to show that free and equal elections are the true end to be secured, and that the system of laws regulating the elections is only the means of securing the end; that this system of regulation is the subject of legislation over which the legislature exercises a sound discretion; that no clause in the Constitution requires *uniformity* of regulation, or prohibits legislation according to the obstacles which different localities present to prevent a free and equal election; and that it is a mistake to substitute uniformity of regulation, for the free and equal election which it is the object of regulation to secure. We have also shown that none of the features of this law subvert the rights of the true electors of this city, and that is the only test of the constitutionality of any provision contained in the law.

It is true there is a kind of liberty this registry law will destroy. It is that licentiousness, that adulterous freedom, which surrenders the polls to hirelings and vagabonds, outcasts from home and honest industry; men without citizenship or a stake in the government; men who will commit perjury, violence and murder itself.

[Patterson *v.* Barlow.]

To prevent this is the purpose of this law; and it should have the aid of fair men of all parties to give it a fair trial, and secure its true end. It may have defects—doubtless it has—and what system devised by the wit of man has not; but its defects, if any, should be remedied as they are disclosed by experience. The law is not unconstitutional. It is a part of the political system of the state, on which its offices, and its very continuance depends; and we, as a court, have no right to put our hands upon the whole system, on grounds of mere hardship, or for defects of regulation, which are not clear and palpable violations of the letter or very spirit of the Constitution.

> The decree of the Court of Nisi Prius is reversed, the special injunction dissolved, and the case remanded for further proceedings.

[At the time of writing the foregoing opinion, the court had not been referred to the Debates on the Registry Law in the Convention of 1837. Indeed it was stated in argument, that the debates in committee of the whole were not published. Since then the following information has been supplied. The amendment of Mr. Sterigere, referred to in the opinion, was presented to the report on the 3d article, when in committee of the whole, and not to the report on the 9th article. It will be found on the 29th page of the 3d vol. Debates of Convention; and was afterwards divided, leaving the question on the 2d clause in these words (see page 57): " The election laws shall be equal throughout the state, and no greater or other restrictions shall be imposed on the electors in any city, county or district, than are imposed on the electors of every other city, county or district." The vote on this branch stood 49 to 67 (see page 81); and the amendment was therefore disagreed to. The debate on the registry question occupies fifty-two pages, and the constitutionality of such a law was fully discussed by some of the ablest men in the convention. The vote against the amendment was therefore most decisive; and hence but little was said when Mr. Sterigere offered it again on the second reading of the report on the 9th article, and it was suffered to fall by the call of the previous question.]

Dissenting opinion by THOMPSON, C. J.

Not being able to concur in the opinion expressed by the majority of the bench, that the Act of Assembly, known as the Registry Act, approved April 17th 1869, is constitutional, respect for them, and duty to the public, require a statement of some, at least, of the reasons which have compelled me to dissent from that opinion. This I will do as succinctly as possible.

It is an axiom with us, in this country, that all governmental power is primarily in the people; that laws are enacted only to

[Patterson *v.* Barlow.]

embody and give expression to their will, and to declare in what manner, and by whom, that will is to be exerted and made practical. To this end, therefore, laws are enacted by the people in their primary capacity, and called constitutions; and secondarily, by legislators acting under these constitutions. The former cannot be limited, abridged or altered by the latter. The constitution is the supreme law and rule of action, to which both people and legislature must bow in submission, until it be changed by the authority which established it—the people. Wherever it declares a right, the right necessarily is irrevocable by any power or means, direct or indirect, excepting only by the people acting in their primary legislative capacity; in other words, by altering or changing the constitution in which it is declared.

Of this nature are the provisions of the Constitution of this Commonwealth relative to elections by the people. It is there declared in affirmative and most explicit terms, who shall enjoy the rights of electors, and on what terms. No power, therefore, short of the people themselves, acting directly on these provisions, can detract from the rights declared, or add a syllable to the qualifications agreed therein to be essential to their enjoyment. To attempt such a thing would be an effort at usurpation; its success, an overthrow of the Constitution itself. No one will disagree with the affirmation, that if the right of elections by the people, secured in the Constitution, be subject to legislative restriction or limitation, as times change and parties dominate, there will remain but little of the Constitution worth preserving.

Nor is it to be maintained that because an assault on a right avoids the boldness and effrontery of directness, it may be regarded as harmless and justified, because based upon an assumption of morality. Even although it might not be intended, it is an insidious mode of attack, and all the more dangerous. Better an open enemy than a secret foe; that an assault should be open than covert. I desire to deal, however, not so much with intention, although apparent enough for the passage of the law under consideration, as with its effect and operation on the equality and freedom of elections.

It may be safely assumed that whatever embarrasses or renders difficult of enjoyment an undoubted right, just so far it impairs the right itself. To speak without circumlocution, and to the point under consideration, it seems to me an incontrovertible position, that whatever legislation embarrasses and renders more difficult than is requisite to its enjoyment, the right of an elector to vote, impairs the right itself, and as a consequence is a violation of the provisions of the Constitution on the subject. This is the doctrine of this court as expressed in The Commonwealth *v.* Maxwell, 3 Casey 444, wherein it was said, "A law intended to take away, or unnecessarily postpone *or embarrass the right of election,*

[Patterson *v*. Barlow.]

would be set aside as unconstitutional." This was repeated, as sound in the opinion of this court, in Page *et al. v.* Allen *et al.*, 8 P. F. Smith 338, declaring the Registry Act of 1868 unconstitutional and void. Common sense would revolt at any other doctrine. That this was said of an attempted construction of law which would postpone the election by the people of a judge, does not distinguish it from the embarrassment of the right of an elector in any other case, as contended for in argument.

A right surrounded by such details, requirements and difficulties as to embarrass its enjoyment at every step, is hardly to be regarded as a right at all. It is more properly characterized as a *chance* for the enjoyment of the specific right. In my judgment, after a most sedulous effort to master and comprehend its details, that is just the nature and character of the right pertaining to a large body of electors in the city of Philadelphia, under the Registry Act. Learned professors of the law may possibly master its numerous and involved details; the masses never can thread its mazes, unless furnished by some friendly hand with a clue to lead them through and out of the labyrinth. One would naturally expect plain provisions in aid of the enjoyment of a plain right, if that were the purpose of the enactment on the subject.

This act was undoubtedly *intended* to render the exercise of the right of voting by the electors of this city, *more difficult* than under the Election Law of 1839, a law, under the provisions of which the people contentedly voted for thirty years, and for the repeal of which, so far as appears by the journals of the last legislature, not a petition emanating from the people was presented. The professed, and possibly the real object of the law, was to prevent fraud in elections by *voters.* If this was the view of the framer of the act, I must in charity believe that it so engrossed his attention, as to lead to forgetfulness that among the barriers so ingeniously contrived to prevent it, the defeat of the duly qualified voters must inevitably occur. A remedy for a disease must be regarded as empirical, which would only eradicate it by producing a worse. If frauds were imminent by simulated voters, let penalties be provided for the rogues, and set honest and vigilant men to watch them, but let not the rights of honest voters be sacrificed to these apprehensions. If such were the principle of legislative action on the question of a preventive remedy, assuredly the fewer votes there should be allowed to be polled, the more the danger of fraud in voting would be diminished, and it might be entirely prevented if no voting whatever were allowed. To this absurd result, the principle necessarily leads.

But I have shown, I think, that to embarrass a voter in the enjoyment of his right, impairs the right itself, and is against the constitutional grant of it. That this act does so in the case of a large class of voters, we have it conceded by the learned opinion

of the majority. "True, the omission" (from the primary assessment of their names), says the opinion, "requires of single men, clerks, journeymen and transient persons, a greater vigilance to secure their suffrage, but the *hardship* is not imposed by the law, but the necessity which requires it, in order to protect them, and all other honest electors, from being supplanted by it."

*Hardship* is thus admitted to exist as to the class of voters mentioned.

But why should they be subject to greater hardships in the enjoyment of their rights than others? Why not subject all alike to the simple process allowed by law, as in other cases, to establish their rights *when they offer to vote?* The Constitution confers a perfect equality of rights on all citizens of competent age and qualification to exercise the rights of electors. Is this to be set aside by an assumption of frauds practised, even if the fact be undoubted? Certainly not, or honest men might lose their rights because rogues exist. But the reasoning based on the assumption, like the law, in this case, is applicable only to Philadelphia. The assumption must be that there are no rogues in the other cities of the state, or in the country districts; if this be not so, the act is simply a discrimination to cut down the voting population of Philadelphia. Such an assumption would be absurd, as the foundation for legislative action. Fraudulent voters are to be found in these cities, and in the country, as well as in Philadelphia. Why then impose the "*hardship*" and require "*vigilance*," in order to enjoy a right common in origin and extent to all, on voters in the city? I hold that *hardship*, which is another term for *embarrassment*, in the enjoyment of the rights of an elector, imposed by law, impairs the right and is inadmissible, as the result of legislation, even if co-extensive with the state; but when there is superadded to this embarrassment of city voters, inequality in the manner of the enjoyment of the right between them and other citizens of the state, the character of the act seems to go beyond an interference with rights simply, and to reach to an attack upon their liberties.

Neither during the argument, nor upon reflection since, have I been able to discover wherein the idea of these inequalities is deducible from the Constitution, or how one class of citizens in a particular locality in this Commonwealth, shall not enjoy a grant of a right to all sections and to all citizens possessing the same qualifications without distinction of qualification, and be constitutionally subjected to different laws, imposing hardships on it not imposed on all! The plain words of the Constitution teach perfect equality, so far as the law is concerned, in regard to rights established by it. It is to be read and understood according to its words, in their usual and ordinary sense, said Gibson, C. J., in Monongahela Navigation Company *v.* Coons, 6 W. & S. 101,

[Patterson *v.* Barlow.]

quoting as authority the opinion of Tilghman, C. J., 3 S. & R. 69. There is not a shadow of a shade, for an implication of possible inequality by law in the exercise of the right of an elector in the Constitution, and that there is a strong implication to the contrary, was the candid admission of the most experienced of the counsel who argued in support of the law. It cannot escape the attention of any reader of the Constitution, that each class of electors—for the difference in qualifications justifies the propriety of classification—stands on the same footing, wherever its members are to be found, whether in the city, or in the country; and so they have always stood, with the exception of the period of three years, covered by the discarded and unjust Registry Act of 1836. That equality is destroyed by this act, and that persons will be free and unembarrassed to exercise the right of suffrage out of the city, while others with the same qualifications exactly, shall not exercise it on the same terms in the city of Philadelphia, and may not be able to enjoy it at all, owing to the embarrassing provisions in regard to the proof required, is, beyond dispute, the effect of it.

It has been argued that inequalities are necessarily incident to the exercise of the rights of the electors. And those of the locality of the voters, and differences in the time of opening and closing the polls in some places from others, and differences in laws creating election districts, have been referred to. I need not spend time in showing that such diversities, partly natural, and where otherwise, the result of laws asked for by the electors themselves, or not complained of, are not parallel to the case where the actual right of voting is infringed—impaired, and to a large extent rendered impossible by law, as will be shown in the case under the law in question. But even in regard to some of those regulations, cited as illustrative of the argument, if they should have the effect to defeat, or greatly embarrass the right, and *so intended*, no matter on what pretext, or for what purpose, they would be unconstitutional and void. If, for instance, but a half an hour, or an hour, were in populous districts only allowed to electors to deposit their votes; or the places selected for the purpose were such as to be a virtual denial to all but the vigilant and vigorous to exercise the right of electors, would anybody doubt the invalidity of the legislation which should sanction such things?

The Constitution of our Commonwealth is an inviolable charter of equality of rights to all in the exercise of every right established by it, and there is not a shadow of an implication that it was not so intended in regard to the rights of electors. Read it. It says: "In elections by the citizens, every white freeman of the age of twenty-one years, having resided in the state one year, and in the election district where he offers to vote ten days immediately preceding such election, and within two years paid a state or county tax, which shall have been assessed at least ten days before

[Patterson *v.* Barlow.]

the election, SHALL ENJOY THE RIGHT OF AN ELECTOR." The remainder of the section need not be quoted in this connection.

Now it is an elementary principle of law, that all general statutes operate equally on all persons or things embraced by their terms, within the jurisdiction of the law-making power, where there are no restrictions or limitations contained in them. Shall the Constitution have a different construction? Shall limitations be implied, which import possible inequalities among the people themselves in an instrument, the purpose of which was to guard against any such thing? The most skilful casuist will search in vain for a reason which would be satisfactory, why the people should intend that the legislative body, created by themselves, to act in obedience to the Constitution, should have the power to diversify the enjoyment of their guaranteed, uniform rights, especially the right of suffrage, the corner-stone of the government, or render the enjoyment of it contingent, uncertain or burthensome, to any of the classes upon whom it was conferred. The grant being identical to all qualified to exercise it, and without restrictions imposed on any, not imposed on all the classes enumerated, it seems to me it would be a palpable perversion of the rule to hold that the Constitution sanctions legislation establishing a different, or changing the rule established by itself. The clause quoted establishes a uniform rule throughout the Commonwealth, and *commands* that every citizen possessing the qualifications mentioned—no more, no less—"shall enjoy the rights of electors." This is the rule of the Constitution. Can the legislature say that the electors may be subjected to a different rule? This would overthrow the rule. That this is the effect and result of the maintenance of this registry act, as between different portions of the Commonwealth, as well as citizens, my brother Sharswood has shown most conclusively in his opinion in the case at Nisi Prius, to which nothing could be added to strengthen the argument. Indeed, so conclusive was its reasoning regarded, that it wrung assent to its doctrines from unwilling quarters, if party predilections may be considered. A majority of my brethren, however, have discarded the uniformity and universality of what we claim as the rule of the Constitution, and have accorded an omnipotence to the legislative power equal to changing it, and establishing another and different rule, one which subverts both the uniformity and equality of the Constitution. The evils of such a conclusion I fear will not end with the partial legislation contained in the act. It will be a precedent for other legislation of the same character, and in time the electors of one county may be subject to terms of registration infinitely more embarrassing and onerous than those of another, by which virtual disfranchisement may ensue to many electors, otherwise entitled to enjoy the right.

We have been admonished in the opinion of the court that

[Patterson *v.* Barlow.]

apprehension of an abuse of power, is not a legitimate ground on which to base an opposition to its unlimited exercise by construction. It was the apprehension of abuse of power by legislative bodies that brought into existence constitutions themselves. The argument against the apprehension is an argument for uncontrolled authority—no more, no less—and *that is despotism.* I admit that it is not an argument where the power is express, but we are treating of a case in which the power is far from being express, to create different terms on which the right of electors may be enjoyed in different counties and cities. The difference between us is, whether that construction is best which allows to the legislature the unlimited power to discriminate between the people of the different sections, and even of the same section, to the extent of embarrassing the one and allowing unencumbered facilities to others; in other words, constituting privileged sections and privileged classes of the same section; or that which denies all inequality by law, among the qualified electors of the state. That is the contest here, and who that hopes for fairness in elections can hesitate about who is right?

It seems to have been assumed by the draftsmen of this bill, and adopted in the opinion of the majority, that there is something of a lower degree of morality in the city of Philadelphia than in other cities of the state, which justifies a different rule in regard to its electors, and requires them to be more closely scrutinized in the exercise of their rights. " Clearly," says the opinion, "the feature complained of" (the difference between the rules for registration in the city and country) "is a useful provision to protect the rights of the true electors of Philadelphia, and to reach the unqualified persons found at such convenient places just upon the eve of an election, when votes are needed by unscrupulous men. Its purpose is to exclude the fraudulent element * * * in order to protect other honest electors from being supplanted by fraudulent voters. What clause of the Constitution forbids the power to be exercised according to the *exigencies of the circumstances*" * * * * " Where low inns, restaurants and boarding-houses constantly afford the means of fraudulent additions to the list of voters, what rule of sound reason or constitutional law forbids the legislature from providing a means to distinguish the honest men of Philadelphia from the rogues and vagabonds who would usurp their places and rob them of their rights?" This assumption is thus, at least apparently, the justification of this act.

It would seem, therefore, only necessary to assume a want of morality in a particular district, to justify the legislature in dealing with that locality, so as to embarrass the rights of its electors, and impede the exercise of them to any extent which may be thought necessary, in order to distinguish the " honest citizens from the rogues." It will be a sad day in this Commonwealth

when such a right as that of an elector shall be made to depend on such an assumption, and that, as already said, is what seems to be the justifying rule for the legislation in question.

It is claimed that this legislation is a regulation of the exercise of the constitutional right of suffrage. It is a perversion, it seems to me, of the right to regulate, to carry it to the extent we have here, of virtually destroying, at least impairing, the rights professed to be regulated. A regulation must necessarily be subservient to, and in aid of, the thing regulated. An elector is not surely to be deprived of his right by a regulation; this would constitute the regulation superior to the right. The order of things would thus be inverted. Chief Justice Chase has lately expressed the true idea on this point, in The State of Texas *v.* White, Am. L. Reg. 1869, p. 765, namely, that the means necessary to execute a power must be only such as are necessary and proper for carrying into execution the power conferred.

The difference in the requirements under this act, in order to enjoy the rights of an elector in Philadelphia, and the same rights in other portions of the Commonwealth, does not stand on the power to regulate. The reference I have made to the opinion of the majority, it seems to me, admits this, and shows that the object is exclusion, by restricting, under pretence of excluding fraudulent votes. I have shown that so far as regulations embarrass and interfere with the enjoyment of the rights of an elector, it is an infringement of his constitutional right, and void. This must be so, for if the legislature may, to any extent, interfere with the right, it has no limit but legislative will, if the Constitution be impotent to protect; and the more uncertain will the right become, in proportion as party spirit intensifies the fears of the party which happens to be in power, that its opponents are about to overthrow it. The assumption of the fact of instances of fraudulent voting (and it seems it needs no more solid foundation), may be made the foundation to increase the requirements to be registered, and consequently impose difficulties in the way of voting, so as to render it in a great measure impossible. That is what legislation, like that we are considering, will be sure to lead to. Year after year, different and more complicated regulations may be required in particular localities, until the right becomes virtually abolished.

We will now for a moment recur to the operations of the Registry Act in Philadelphia, compared with its operations in the country, and in the other cities of the state, and in this examination it cannot fail to be seen how different are the terms on which the constitutional voter exercises rights in the former and in the latter.

Outside of the limits of the city, the assessors furnish the list of voters, and return indiscriminately the names of all whom

they know to be qualified voters, whether housekeepers or boarders, and in case of non-assessment, they may be added to the lists, by simply applying to the assessor, and if proof be required, any competent witness can make it.

In the city, the assessors are allowed *only to return*, on their own knowledge, qualified householders, and persons residing therewith, and qualified electors keeping inns or hotels, sailors' boarding-houses, and restaurants, but are prohibited from entering upon their lists the names of any qualified elector or other person who might be qualified, who happen to board at either of these places, or the name of any qualified elector who has not a fixed residence.

Electors who happen not to be householders, but only boarders, can be assessed only on making personal application to the assessors of the ward, before the 20th of September in each year, at the time appointed by the board of aldermen for making extra assessments, and then on proof by *two qualified* electors of the division, that is to say, by two electors of the class of registered householders, or hotel, or sailor boarding-house, or restaurant keepers, that the applicant is a resident of the division, and if required by any of the assessors, these witnesses must state that "they verily believe the applicant *will be* a qualified voter at the next general election." This is in disregard of the decision of this court last year, that such proof cannot be required before election day, and is a qualification required by this act to be proved, notwithstanding it is in anticipation of the time of voting.

In addition to the proof by the special witnesses, the applicant is required, in effect, to give to the assessors a synoptical history of his life. He must state, under oath, his age, where born, place of residence, occupation, number of the house where he boards, how long he has resided in the state, the date of the commencement of such residence, what election district he claims to be assessed in, and "that he now resides in the city of Philadelphia, and that he has no other place of residence, and that he did not remove to the said election division for the purpose of voting therein, but for the purpose of making it his place of residence."

After all this has been embodied in the certificate contained in the act, being a form for all cases, a tax of fifty cents is to be assessed on the applicant, without any reference to the fact of prior assessments which may have been made the same year upon the property of the applicant, or of taxes paid by him; and being furnished with the certificate, according to form, signed by the assessors, he may present it to the receiver of taxes, and on paying the sum therein assessed upon him, he is then entitled to a special receipt from him, reciting the assessor's action in his case. Having gone through all this, the applicant is supposed to be assessed and a qualified voter, unless the canvassers strike out

[Patterson *v.* Barlow.]

his name by drawing "a red line through it," as they may do, or he is not successfully challenged at the polls.

This is but a sketch of the process through which the non-householder in Philadelphia must go. Who can imagine the annoyances and difficulties which will be actually encountered in passing through such an ordeal? The uncertainty of results and contingencies of enjoying the right after all, leave it but the shadow of a right; a chance in many opposing chances, to vote! It would be an impeachment of common sense to argue that there is not here a most flagrant discrepancy and embarrassment created by law between the citizens of this Commonwealth in the enjoyment of the right of electors. In the country districts, proof of residence can be made by any single qualified elector, whether a householder or not; in the city, two are required, and they must be householders! As if truth were truth only from the mouths of this privileged class!

I may admit, however, without injury to my position, that it may not have been intended by this act to impugn the moral character of the class of electors who are neither householders, hotel, restaurant and sailor boarding-house keepers, by constituting the latter exclusively the witnesses to prove residence in order to put an applicant on the extra assessment lists. That was perhaps not the object. The object was to *render the proof of residence more difficult!* No reason but this can be assigned. No man, however clear his right, can be assessed at the extra assessment, if proof of residence be demanded, as it will always be sure to be; indeed, as required, if I comprehend the law, unless personally known *to the privileged class of witnesses, viz.: householders, innkeepers, restaurant and sailor boarding-house keepers of the division.* The fewer persons known by them the fewer names will be found on the lists. If one witness were competent to establish the fact in each case, nearly all applicants might possibly be registered, but two must know the applicant's residence. Even then, how are the applicants to compel the attendance of these important witnesses? There is no provision to compel it; no subpœna is authorized to be issued, and no power given to punish for contempt in disobeying it, if it were issued. It is in every *feature a scheme* to prevent registration, and by this means to deny to the citizens of Philadelphia the enjoyment of the rights of electors which the Constitution has said *they shall enjoy,* and which are enjoyed elsewhere. Age, residence, taxation, and every qualification may be perfect, but unless the two qualified witnesses voluntarily appear to attest to the residence of the applicant he cannot be registered, and he cannot vote at the polls. This is truly an uncertain tenure upon which this great right is made to depend.

With a prescience that seems to have foreseen designs and

[Patterson *v.* Barlow.]

schemes to weaken and destroy this right, it was attempted to be guaranteed as a right to be enjoyed by all citizens possessing the constitutional qualifications, and therefore in the Bill of Rights it was solemnly declared:

" That .elections shall be FREE AND EQUAL:" Art. 9, sec. 5, Constitution.

Of this provision, as well as of the other provisions in the Bill of Rights, sec. 26 of the Constitution provides that,

" To guard against transgressions of the high powers which we have delegated, WE DECLARE that everything in this article (the Bill of Rights) is excepted out of the general powers of government, and shall FOR EVER remain inviolate."

The declaration " that elections shall be free and equal" it is said is satisfied by limiting electors to an equality in number of votes that each may give. This position is necessary in order to arrive at another; that inequalities in the exercise of the enjoyment of the right must yield to the power to regulate it. And this leads necessarily to the corollary that every qualified citizen may give the same number of votes as any other individual, provided that regulations, such as registration acts, are not complex enough in requirements to exclude the voter altogether. I submit that such a deduction is inevitable, if regulation may go the length claimed in this act.

I have shown, I think, that all regulations must relieve and operate in aid of the right to be regulated, and whenever they tend to defeat it they are void. I have also shown, I think, and will further show, that this registry act not only embarrasses but tends to defeat the rights of electors altogether in many instances, and that it is discrepant between sections and between individuals. Can it be constitutional? The solemn declaration in the Bill of Rights is nothing if this be its interpretation, and the act in question be a true exponent of it.

But it is claimed that uniformity is not the rule of the Constitution, because an amendment proposed in the Constitutional Convention of 1837–8, " that the election laws shall be uniform throughout the state, and no greater or other restrictions shall be imposed upon the electors in any city, county or district than is imposed upon the electors of every other city, county or district."

It is true this amendment was offered, but it is equally true it was never voted on at all by the Convention. It was disposed of by a call of the previous question, which had the effect to cut off all the proposed amendments, and brought the Convention to a direct vote on the section. This was the effect of the previous question under the *lex parliamentaria:* Cushing's Law and Prac. of Leg. Assemblies, §§ 1418 and 1526, and was its effect on the amendment in question in the Convention, as appears by the opinion of the majority in this case.

[*Patterson v.* Barlow.]

The only evidence, therefore, that is deduced, or deducible, from the failure of this amendment, consists in the fact, that the Convention sustained the previous question, which cut it off with all others proposed or intended to be proposed. It is not a legitimate deduction, that the previous question was sustained in order to cut off that particular amendment, or because of it. As there is nothing to disclose the reason any member may have had for his vote in sustaining the previous question, and as each may have had a different reason, some because of the amendment in question, or others meditated were not needed, the section of the Constitution without it importing uniformity by its terms; others, that it was not in proper form perhaps, or out of place; and still others desirous of ending debate on the section and preventing all amendments; each having his own individual and undisclosed reason, it does not follow that uniformity in the election laws was not intended. The Constitution is to be understood by a plain reading of what it contains, and not by what it does not contain. It is the instrument of the people—to be read and understood by them in its plain, untechnical sense, and in this sense it is to have effect, and not in what it does not say, nor by what may have been understood. Of similar terms used, perhaps, hundreds of years ago, as in the Statute of Westminster, cited as an illustration, they may adorn an argument, but fail to rule the interpretation of the Constitution. I regard this proof that the election laws need not be uniform, as without the slightest force whatever.

The fact that in 1836 a registry law for Philadelphia was passed and existed for a time, advances the argument for non-uniformity not a step. Whatever there is in the fact that it was passed, is counterbalanced by the fact, that it was in a very short time repealed, and the Act of 1839 passed, by which an entirely uniform system throughout the whole state was established. It was tried long enough, however, to demonstrate its capacity for perpetrating the most frightful frauds on the rights of electors, and on the results of elections. Many reasons might be given why it was not judicially tested in this court, and among them is the fact that chancery jurisdiction was only, in the same year, conferred on this court, and was new in practice, as it was unsettled in the extent of equity jurisdiction. But it is a feeble inference of its constitutionality that it was not so tested, considering its brief existence. If there be any force in such an inference, it results from the assumption that what has not been adjudicated upon at all, is to have the same effect as if it had been; an inadmissible conclusion certainly.

The character of uniformity which the Constitution, in case of qualified electors, requires, is utterly set aside as to one class of them, viz., naturalized citizens.

Everybody knows, or ought to know, that a naturalized foreigner is a citizen, by a law of Congress, and entitled to all the rights of

[Patterson *v.* Barlow.]

native born citizens. In this registry act, § 1, applicable to the country and other cities of the state, the foreign born citizen can be assessed ten days before election, by presenting his certificate, and without it, if he has been a voter in the district five years, and without being naturalized even, if he has declared his intention, and will be entitled to naturalization before election day. Sons of naturalized citizens may also be assessed, on proving citizenship, by virtue of their fathers having been naturalized.

In the city of Philadelphia, the rule is widely different. No citizen can be assessed later than seventeen days before election day. On the subject of naturalized citizens, the 35th section speaks: "Every person of foreign birth, claiming a right to be assessed * * * shall, in addition to the proof of residence (by two qualified, *i. e.*, assessed householders), prove that he has been naturalized conformably to the laws of the United States, and as evidence thereof, he shall produce a certificate of naturalization under the seal of the court in which said naturalization took place, duly attested by the signature of the prothonotary or clerk, in his own proper handwriting; and shall prove by the oath of a qualified elector of the division, that he is the person named in the said certificate, and the person to whom it was issued * * * when and where he was born, and when and where he obtained the said certificate, and from whom, &c." And no foreigner, having declared his intentions, although entitled to naturalization before election day, can be registered in the city, and consequently cannot vote, although actually naturalized, before that day. There is no provision for the assessment and registration of such, nor any that I can see, for the registration of the sons of naturalized citizens. These two classes, it seems to me, are excluded in the city, although the most conclusive proof might be given of their constitutional qualifications on election day. Citizens of full age, and tax-payers, they may be on that day, yet, as classes, they are utterly excluded from enjoying the right of electors. Notwithstanding all this, we are assured, nay, it is decided, that the act which produces such a result is binding and valid. I do not think so, for my part.

The provisions of this section of the law cannot be read, I think, without the conviction following, that they were incorporated with a view to exclude, as far as possible, foreign born, or naturalized citizens.

How is it possible, it may be asked, for such an applicant for registration, to prove the handwriting of the clerk or prothonotary who signed his certificate? He may have been a resident of a distant country, or in a different state, and how is he to prove it under such circumstances? Having proved it, how is he to bring conviction, that the proof is true or sufficient, to the minds of the assessors? How is he to get the witnesses before them?

10 P. F. SMITH—7.

[Patterson *v.* Barlow.]

But suppose that established, how is he to make the additional proof that he is the very person to whom the certificate was delivered? Formerly, the presumption was conclusive, when uncontradicted, that the holder was the person to whom it was issued, especially when supported by his own oath; now, he must prove this, if I understand the act—but how is it to be done without a witness who saw it delivered? Nor will it be possible in all cases, for the applicant to state the irrelevant facts of when and where he was born, and from whom he received his certificate of naturalization? There being no requirement of such a thing in the law when he received it, he may never have thought it necessary to make the inquiry. Nor is it necessary; for the seal of the court imports all facts of due execution, and itself is conclusive. Yet this *ex post facto* requirement, if not proved as required, may defeat the elector. Impossible, in a majority of instances, as a compliance with these requirements will be, still the letter of the statute demands that it be done; and it can only be done by disregarding the terms of the statute. A break in the chain of requirement will defeat the elector. How can any provision be regarded as constitutional, the effect of which is not only to embarrass electors, but, in many instances, to strike down their privileges?

In McCafferty *v.* Guyer *et al.*, 9 P. F. Smith 109, Strong, J., in delivering the opinion of the court, in speaking of the right of an elector, said: " It is in the nature of a constitutional grant of privileges that cannot be taken away by any authority known to the government. It involves a prohibition of interference with it." This was said in what is known as the deserter cases, wherein it was contended that there was no clause in the Constitution prohibiting the legislature from forfeiting an elector's rights for the cause of desertion mentioned in the act. That legislation was held to be unconstitutional, and other similar attempts, as shown in the opinion, to have from time to time been made, and proved abortive.

But I cannot leave this branch of the subject without noticing the inequality between citizens of foreign birth in the city of Philadelphia and out of it. In this city an unnaturalized citizen cannot be assessed, and if naturalized after the 20th of September, cannot be registered. Out of this city he may be registered if he has filed his declaration of intention to be naturalized, and may be a voter if naturalized at any time before he offers to vote. Nor is the foreign born citizen obliged to pass through the ordeal of proof noticed, as required in the city, or in any other part of the state; and I see not how sons of naturalized citizens are to be registered in the city; outside of it, the law presents no difficulties. The Bill of Rights is a mockery, which declares that elections shall be free and equal, if such partial legislation be constitutional.

But the inequality of the legislation is even more signally illustrated in its operation between the citizens of Philadelphia themselves. One class, viz., private householders, and residents with them, hotel keepers, restaurant and sailor boarding-house keepers, may be assessed at the option of the assessors without auxiliary proofs. All other citizens are to be registered only on the production of the special proofs I have already noticed, to wit—by two members of the privileged class. Outside of that class, even the judges who interpret the act, if boarders, would not be competent to place a voter on the registry ; two boarding-house keepers of the division could. " This," says the opinion of the majority, " is to exclude the fraudulent element, by compelling all persons, not known householders and fixed inhabitants, to come personally before the proper board and make proof of their rights."

In this class-legislation—it is nothing else—there is an imputation against the morality and integrity of the non-housekeeping and hotel-keeping class as undeserved as unjust.

The presumption of the constitutional provision is in favor of the honesty of all electors alike. But even if true, as it is assumed, the voters of this class are neither to be excluded nor embarrassed. The rights of an elector rest not on any moral, but on a legal *status*. With the qualifications of the Constitution in his favor, he is not to be excluded on any assumed or even real ground of moral *status*. The governing power in this country is the people, and it is made up of all classes. The compact between the people, namely, the Constitution, settled who should be voters, and this was a prohibition against interference with the arrangement. It is idle to say that that is not interfered with, if proofs be demanded of the right, so limited in character, on the assumption of want of morality in a certain class of citizens, as to render the proof itself precarious. That is the effect of restricting the testimony to establish residence to the privileged class noticed, viz., housekeepers, hotel-keepers, restaurant and boarding-house keepers.

Not only will the difficulty of proof deprive many a voter of his right, but inability to comprehend the multiplied requirements through which he must pass in order to be put on the extra assessments, an indispensable preliminary to voting, will defeat more. A little additional complication of details would exclude almost every man from the extra assessment. All boarders, clerks, journeymen, laborers and others not of the privileged class of housekeepers, &c., must get upon the extra assessment lists, if at all, by the kind of testimony and machinery mentioned.

In this country of equal rights, it can hardly be claimed that a statute destructive of an equality created by the Constitution, can be binding. But it is argued that it is so unless expressly prohi-

[Patterson *v.* Barlow.]

bited. This is always said where the pressure is severe for an argument, but is mostly untrue. There are many things that the Constitution does not prohibit, but which all will agree conflict with it. Is it necessary to find a prohibition, for instance, against an attack upon the principles of liberty itself? This is no stronger an instance than an attack which distinguishes unfavorably one class of electors as compared with another. That that is what the Registry Act does, I have shown, and it is not denied in the opinion which has been pronounced sustaining it. It is, however, as wearisome to follow in detail this incongruous legislation, as it is painful to contemplate its unequal, and therefore unjust operations. There is, nevertheless, a feature or two more I must not omit to notice.

The law in question is an election law, not a tax law. To enjoy the privileges of an elector, the claimant must submit to the imposition of a tax. Small though it be, it is in principle the same as if ten times as large. It is not said that the householding voter must pay it before voting, but it is positively required to be paid by all who may be placed on the extra assessment lists in the city. I presume this number will not fall short of one-tenth of the voters, and may greatly exceed it. It is the privilege of the elector which is thus taxed; it is a step in the process of registration—which is a preliminary to voting—it is therefore a tax on the right. This is so beyond controversy; for no others than those who claim to be registered are assessed with this tax. The Bill of Rights ordains that elections shall be free and equal. Free on the condition of paying tribute for the enjoyment of the right, says the act. Is a right free which must be paid for? The tax which the Constitution prescribes was to indicate who should be entitled to be electors; that was sufficient for that purpose—but that is not the purpose of this tax. Its object is to raise money for the city treasury. It is small now, but the principle sustained is capable of indefinite extension. Fifty cents is the limit this year, five or ten dollars will not be distinguishable in principle next. It is this year applicable to Philadelphia, next it may become a tax on Lancaster or Pittsburg, and Philadelphia be exempt. Vagrant—its inflictions will be felt wherever party impulse may choose to send it.

Constitutional rights are inviolable from all quarters, whether by the embarrassing operations of tax bills or otherwise. This was intended to be the use of the Bill of Rights, and it places all rights declared, on the same footing. What would be said of a tax upon the exercise of the right to worship God according to the dictates of conscience, or on the right of trial by jury? They stand on no higher or other grounds than do the rights of an elector. If the one may be taxed may not the other? It would shock the sense of the entire community to think of such a thing

[Patterson *v.* Barlow.]

as a tax on religious exercises, and yet the principle is the same. I regard this tax as palpably in conflict with the Bill of Rights. Nor can it be omitted from the system ·on which it is engrafted, for it is too deeply rooted in it to allow of its excision without destroying the whole.

There is another feature, that my brother Sharswood has shown, beyond cavil, to conflict with the Constitution. That is the last period fixed by the act for assessments in Philadelphia. Some years it will be twenty-three days between the 20th of September and the second Tuesday of October, and never less than seventeen. The Constitution fixes the outside limit ten days before the election. The tax must be assessed at least ten days before the election, says the Constitution. It shall not be, says the act. Which shall prevail; or, in the face of the decision pronounced, I ought rather to ask, which ought to prevail? Can any one hesitate to answer?

A reason is given for sustaining this law, which to me is novel indeed, and directly overrules what this court determined last year, in the registry case then before us, viz.: that the repealing clause will stand, and all election laws we have will be repealed, if the act in question be held to be invalid. The repealing clause only has effect if the act to which it belongs be valid. It is predicated of the validity of the substituted provisions. I will not argue a proposition so self-evident. Wherever it is parcel of a substituted act, it lives or dies with the body of which it is part.

But I forbear further remarks. This opinion is far too long. It is written in the sole hope that the people will vindicate their Constitution in due time; if not, conviction of duty must be my apology for the length of it, as it has been my support in the labor necessary to produce it. I am of opinion that the decree made at Nisi Prius in this case ought to be affirmed, and the . appeal dismissed.

Dissenting opinion by

SHARSWOOD, J.—After the benefit of a very full argument, which I did not have at Nisi Prius, and after the most careful reflection, my opinion that the Act of April 17th 1869, Pamph. L. 49, is unconstitutional, remains unchanged. Nor does anything which has been brought forward seem to me to require notice; especially after the dissenting opinion by the Chief Justice, except, perhaps, one ground which has been very largely and principally insisted on. I refer to the alleged decision of the Reform Convention of 1837. Indeed, it is now declared that their vote on the subject "should put an end to all argument on the constitutionality of a registry law." I cannot so regard it. It was, in truth, no decision at all. A vote sustaining a call for the previous question, speaks nothing as to the merits of any amendment

[Patterson *v.* Barlow.]

which may be cut off by it.   One of the objects of such a call,
frequently, is to avoid a vote on the amendment pending.   It is
impossible even to conjecture for what reason the majority voted
in this instance.   They may have been influenced by various rea-
sons.   I mean nothing derogatory or disrespectful to the Reform
Convention, when I say that the probability is that most of them
just followed their file-leader.   *Non constat* but that many of
them thought that the existing declaration of the Bill of Rights
was sufficient.   The rejection of Mr. Sterigere's proposed amend-
ment, by a direct vote upon it, would have proved nothing as to
the opinion of the convention upon the true construction of the
clause, " elections shall be free and equal."   In requiring, as the
proposed amendment did, an absolute uniformity in elections, it
certainly went farther than in my opinion does the clause as it
stands, and much farther than is desirable.   How, then, can it be
concluded that those who voted for that call of the previous ques-
tion thought that the Registry Act of June 16th 1836, Pamph.
L. 705, was constitutional—much less that an act would be con-
stitutional if it did—what the Act of 1836 did not—make a dif-
ferent kind of evidence as to the qualification of voters necessary
in one part of the state from another ?

But if the vote in the Reform Convention had been a direct
declaratory one that such a registry act as that of 1869 would be
constitutional, I would not be willing to accept it as conclusive.
I cannot agree that any authority whatever belongs to the opinions
of that or any other convention on the meaning of an instrument
which they have met to amend.   It is enough to say that their
opinion on this subject was not incorporated with the amendments
which were submitted to and ratified by the people.   The people
did not adopt all the votes and debates of the Reform Convention,
but such only as were embodied and expressed in the amendments
submitted.   In construing the Constitution as the act of the people,
we must look at it as it came from their hands.   Such certainly
was the view taken by the majority of this court in Shollenberger
*v.* Brinton, 2 P. F. Smith 9.   In that case, on the question of
the constitutionality of the Act of Congress making treasury notes
a legal tender, it was strongly urged that the Federal Convention
of 1787 had by a direct vote struck out the clause in the Articles
of Confederation empowering Congress " to emit bills of credit."
Yet that vote is not referred to in the opinion of the majority.
In truth all that can be said of such votes in deliberative
bodies, whether constitutional or legislative, is, that they are what
logicians term, *argumenta ad verecundiam.*   Their weight depends
upon the character of the men who give the votes.   While I feel
great respect for the members of the Reform Convention of 1837,
I am not prepared to hold that their opinions upon the construc-
tion of the Constitution of 1790 are conclusive ; more especially

in view of the fact that the vote of the Federal Convention of 1787 has not been so considered. I see nothing, therefore, in this argument to shake the opinion which I expressed at Nisi Prius, and which I still entertain, that an election at which one class of electors in one part of the state are required to prove their qualifications by two witnesses, and in another part by only one, is not an equal election.